**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 16-36326 (MI) |
| | § | |
| ILLINOIS POWER GENERATING | § | Chapter 11 |
| COMPANY, | § | |
| | § | |
| Debtor.[1] | § | Emergency Hearing Requested |
| | § | |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER**
**(I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO (A) PAY**
**PREPETITION EMPLOYEE OBLIGATIONS AND (B) CONTINUE EMPLOYEE**
**BENEFIT PLANS AND PROGRAMS POSTPETITION; (II) AUTHORIZING**
**THE DEBTOR TO PAY WITHHOLDING AND PAYROLL-RELATED**
**TAXES AND (III) DIRECTING ALL BANKS TO HONOR PREPETITION**
**CHECKS AND TRANSFERS FOR PAYMENT OF EMPLOYEE OBLIGATIONS**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**
>
> **THERE WILL BE A HEARING ON THIS MOTION ON DECEMBER 12, 2016 AT 2:00 P.M. (PREVAILING CENTRAL TIME) IN COURTROOM 404, 515 RUSK STREET, HOUSTON, TEXAS, 77002.**

---

[1]     The Debtor in this Chapter 11 case is Illinois Power Generating Company and the last four digits of its federal tax identification number are 5586. The location of the Debtor's corporate headquarters and the Debtor's service address is: 601 Travis Street, Suite 1400, Houston, Texas 77002.

The above-captioned debtor and debtor in possession (the "**Debtor**"), by and through its undersigned counsel, hereby files this emergency motion (the "**Motion**") for entry of an order (a) authorizing, but not directing, the Debtor to (i) pay or otherwise honor various employee-related prepetition obligations of the Debtor to, or for the benefit of, employees and (ii) continue postpetition certain of the Debtor's employee benefit plans and programs in effect immediately prior to the filing of this bankruptcy case; (b) confirming that the Debtor is permitted, but not required, to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods; and (c) directing all banks to honor prepetition checks for payment of the Debtor's prepetition employee obligations.   The facts and circumstances supporting this Motion are set forth in the *Declaration of Jeff Hunter, Chief Restructuring Officer of the Debtor, in Support of the Chapter 11 Petition and First Day Pleadings* (the "**First Day Declaration**"),[2] filed concurrently herewith.  In further support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.  Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are Sections 105(a), 362(d), 363(b), and 507(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 9013-1 of the Bankruptcy Local Rules

---

[2]      All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

US-DOCS\72869979.12

for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases.

## EMERGENCY CONSIDERATION

3.       The Debtor requests emergency consideration of this Motion.   The Debtor believes an immediate and orderly transition into Chapter 11 is critical to the viability of its operations and the success of this Chapter 11 case.  As discussed in detail below and in the First Day Declaration, any delay in granting the relief requested could, in addition to the negative impact delay will have on the Debtor's operations, potentially cause a default under the Support Agreement (as defined below), which is predicated on, among other things, a swift emergence from Chapter 11.  As such, the Debtor believes that emergency consideration is necessary and requests that this Motion be heard at the Debtor's first day hearing.

## BACKGROUND

4.       On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and commenced this Chapter 11 case (the "**Chapter 11 Case**").  The Debtor is operating its business and managing its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case, and no official statutory committees have been appointed or designated by the Office of the United States Trustee.

5.       A description of the Debtor's business, the reasons for commencing this Chapter 11 Case, and the relief sought from the Court to allow for a smooth transition into Chapter 11 (including the facts and circumstances supporting this Motion) are set forth in the First Day Declaration filed contemporaneously with this Motion   The Debtor hereby adopts and

2

incorporates such description as if fully set forth herein.[3]

6.      The Chapter 11 Case is a "prepackaged" case commenced for the purpose of implementing an agreed restructuring of the Debtor's senior unsecured note debt; all other claims against the Debtor are unimpaired under the proposed Plan (as defined below).  Prior to the Petition Date, the Debtor entered into the Restructuring Support Agreement, dated as of October 14, 2016 (the "**Support Agreement**") with Dynegy Inc. ("**Dynegy**"), certain of the Debtor's other non-debtor affiliates, and the holders of approximately 72% of the outstanding principal amount of the Debtor's senior unsecured notes, including those members of an ad hoc group of noteholders which collectively hold approximately 64% of the outstanding principal amount of the Debtor's senior unsecured notes (the "**Ad Hoc Group of Noteholders**").

7.      A plan of reorganization reflecting the terms of the Support Agreement (the "**Plan**") was filed on the Petition Date, along with a disclosure statement with respect to the Plan (the "**Disclosure Statement**").  The Plan contemplates that all Allowed General Unsecured Claims (as defined in the Plan) will be paid in full or will otherwise be unimpaired.

8.      Accordingly, votes on the Plan were solicited prior to the Petition Date from holders of Class 5 Noteholder Claims (as defined in the Plan), the only class entitled to vote under the Plan.  On the Petition Date, Epiq filed a declaration regarding service of solicitation packages and tabulation of ballots cast on the Plan (the "**Voting Declaration**").  The Voting Declaration showed that 96.9% in amount and 82.9% in number of votes on account of Class 5 Noteholder Claims voted to accept the Plan.

9.      On the Petition Date, the Debtor filed a motion seeking to schedule a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan.  The

---

[3]     The First Day Declaration and other relevant case information is available on the following website maintained by the Debtor's proposed claims, balloting, and noticing agent, Epiq Bankruptcy Solutions, LLC (the "**Voting Agent**"), in connection with this Chapter 11 Case:  http://dm.epiq11.com/IPG.

Debtor seeks to obtain confirmation of the Plan as quickly as the Court's schedule and requisite notice periods will permit.

## RELIEF REQUESTED

10.     By this Motion, the Debtor seeks entry of an order (the "**Order**"), in substantially the form attached hereto as <u>Exhibit A</u>, (a) authorizing, but not directing, the Debtor to (i) pay or otherwise honor various employee-related prepetition obligations of the Debtor to, or for the benefit of, employees (collectively, the "**Employee Obligations**") and (ii) continue postpetition certain of the Debtor's employee benefit plans and programs in effect immediately prior to the filing of the Chapter 11 Case; (b) confirming that the Debtor is permitted, but not required, to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods; and (c) directing all banks to honor prepetition checks for payment of the Employee Obligations.

11.     The Debtor estimates that the aggregate amount of prepetition Employee Obligations it seeks authority to pay under this Motion and all costs and administrative expenses relating thereto is approximately $942,703.46.[4]

## THE DEBTOR'S WORKFORCE

12.     In connection with the Debtor's operations, the Debtor currently employs approximately 217 employees (each an "**Employee**" and, collectively, the "**Employees**"), comprised of 170 hourly Employees and 47 salaried Employees.  Specifically, the Debtor employs approximately 85 Employees at its power generating facility in Newton, Illinois (the "**Newton Plant**") and approximately 132 Employees at its power generating facility in Coffeen, Illinois (the "**Coffeen Plant**").

---

[4]     This amount does not include prepetition amounts owed to the Provider Group under the Services Agreement (as defined below), which the Debtor does not seek authority to pay during this Chapter 11 Case.

13.     Included in the Employee headcount are approximately 170 Employees (the "**Union Employees**") who are covered by collective bargaining agreements.  Approximately 64 Employees at the Newton Plant (the "**Newton Union Employees**") are covered by labor agreements between the Debtor and the International Brotherhood of Electrical Workers, Local 702 (the "**Newton CBAs**"), and approximately 106 Employees at the Coffeen Plant (the "**Coffeen Union Employees**") are covered by a labor agreement between the Debtor and the International Union of Operating Engineers, Local 148, AFL-CIO (the "**Coffeen CBA**" and, together with the Newton CBAs, the "**CBAs**").  The Newton CBAs will expire on June 30, 2018, and the Coffeen CBA will expire on June 30, 2019.  All Employees who are not Union Employees are salaried employees (the "**Salaried Employees**").  In the ordinary course of business, the Debtor incurs payroll and various other obligations and provides other benefits to its Employees.  Maintaining the Debtor's workforce with minimal interruption is critical to maintaining the Debtor's business and operations and to its ability to maximize value through a restructuring.

14.     All of the Debtor's Employees are paid directly by the Debtor.  In addition to and separate from the Debtor's Employees, employees of Dynegy, Dynegy Administrative Services Company, and Dynegy Operating Company (collectively, the "**Provider Group**"), non-debtor affiliates of the Debtor, provide management services to the Debtor pursuant to the Services Agreement, dated December 2, 2013, by and between, among others, the Provider Group and the Debtor (together with related arrangements and protocols, and as amended or otherwise modified, the "**Services Agreement**").[5]  Many of the Debtor's obligations with respect to its

---

[5]     Management services provided to the Debtor pursuant to the Services Agreement include the maintenance of books, records and accounts, administration of finance and treasury matters, administration of tax and accounting services, internal audit, government approvals and proceedings, investor and public relations, strategic planning and business development, legal, compliance, and ethics matters, human resources, business services, contract

Employees are paid indirectly by the Debtor through payments made by the Debtor to the Provider Group in accordance with the Services Agreement. As described in the First Day Declaration, as of the Petition Date the Debtor owes significant amounts to the Provider Group under the Services Agreement as the result of the Debtor's fees thereunder being deferred for a period of time while the Debtor's liquidity was limited. As such, the Debtor owes significant prepetition amounts to the Provider Group, its indirect affiliates, on account of obligations related to the Debtor's Employees. By this Motion, the Debtor does not seek the authority to make any payments to the Provider Group under the Services Agreement on account of amounts due as of the Petition Date. With respect to payments to the Provider Group under the Services Agreement, the Debtor seeks by this Motion the authority to continue to make postpetition payments on account of obligations related to its Employees in the ordinary course of business. The Debtor seeks by this Motion to pay prepetition amounts only on account of the Wage Obligations, Garnishment Obligations, Payroll Tax Obligations, Reimbursement Obligations, and the Non-Affiliate Benefit Obligations, each as defined below, and none of which is paid by the Debtor through the Services Agreement.

A.      **Payroll and Related Obligations**

        15.     <u>Wage Obligations</u>. The Debtor's average monthly gross payroll based on the last twelve months (*i.e.*, gross wages paid to Employees before Employee taxes or other deductions are withheld) for all Employees is approximately $2,319,759.42 (the "**Wage Obligations**"). All Salaried Employees and Union Employees are paid biweekly on Fridays for the pay period ending on the prior Sunday. The last date Salaried Employees were compensated prior to the

---

administration, information technology, operation and maintenance support services, and insurance and risk management strategies. The officers and certain of the directors of the Debtor are employees of the Provider Group, which receives a management fee from the Debtor under the Services Agreement.

Petition Date was December 9, 2016, which primarily included all salaries and wages earned through December 3, 2016, for Union Employees, and December 4, 2016, for Salaried Employees.

16. The Debtor estimates that as of the Petition Date, accrued and unpaid prepetition Wage Obligations (*i.e.*, gross wages to be paid to Employees before Employee taxes or other deductions, including Garnishments (as defined below) are withheld) total approximately $515,502.09.[6] The Wage Obligations the Debtor seeks authority to pay do not exceed the $12,850 cap per Employee under Section 507(a)(4) of the Bankruptcy Code.

17. <u>Withholding Obligations</u>. *Garnishments*. In the ordinary course of processing the Employees' payroll, the Debtor, through Automatic Data Processing, Inc. ("**ADP**"), withholds certain amounts for garnishments such as tax levies, child support, and other court-ordered garnishments (the "**Garnishments**"). The Debtor, through ADP, withholds, on average, $9,578.90 per month on account of Garnishments. As of the Petition Date, the Debtor estimates that approximately $3,584.87 has accrued prepetition that will be deducted by ADP on account of Garnishments (the "**Garnishment Obligations**").

18. <u>Payroll Tax Obligations</u>. In connection with the salaries and wages paid to Employees, the Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Employee Withholding Taxes**") and to remit the same to the applicable taxing authorities (the "**Taxing Authorities**"). In addition, the Debtor is required to make matching payments from its own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment

---

[6]     Employee Withholding Taxes (as defined below) and Garnishment Obligations (as defined below), constitute approximately $279,458.40 of the Debtor's total prepetition Wage Obligations outstanding as of the Petition Date.

insurance, employment training taxes, and state disability insurance contributions (the "**Employer Payroll Tax Obligations**" and together with Employee Withholding Taxes, "**Payroll Tax Obligations**").  As of the Petition Date, the accrued and unpaid prepetition Payroll Tax Obligations are approximately $275,873.50.

19.    As is customary in the case of most large companies, a third party, ADP, maintains or provides record keeping and other administrative services with respect to the Debtor's payroll and various Employee benefit programs.  ADP also administers the deductions from Employee payroll for the Employee Benefit Plans (as defined below).  ADP's services are paid indirectly by the Debtor through the Services Agreement.  The Debtor does not seek to make any payments on account of prepetition amounts owed under the Services Agreement, but seeks to make postpetition payments to the Provider Group that will cover the cost of ADP's services in the ordinary course of business.

20.    Reimbursement Obligations.  The Debtor customarily reimburses its Employees for a variety of business expenses incurred as part of their official duties and in furtherance of the Debtor's business, consisting of, among other things, travel expenses and, from time to time, goods purchased by Employees for the benefit of the Debtor's business (the "**Reimbursement Obligations**").

21.    Generally, the Debtor, through JPMorgan Chase & Co. ("**Chase**"), provides approximately 69 Employees who frequently incur Reimbursement Obligations with corporate credit cards (the "**Chase Cards**") to be used solely in connection with expenses incurred within the scope of their employment by the Debtor.  The Debtor remits payment for these Reimbursement Obligations directly to Chase.  In addition, some Reimbursement Obligations are incurred by Employees through the use of personal funds or personal credit cards.  Employees

are reimbursed for such Reimbursement Obligations through the accounts payable process.

22.     During the six months prior to the Petition Date, the monthly amount of Reimbursement Obligations incurred by the Employees, either through the use of the Chase Cards or through the use of personal funds or personal credit cards, was, on average, approximately $80,000.  As of the Petition Date, the Debtor is aware of approximately $112,000 in Reimbursement Obligations owed directly to Employees.  While the Debtor can provide an estimate of the Reimbursement Obligations, it is difficult for the Debtor to determine the precise amount of Reimbursement Obligations outstanding as of the Petition Date because Employees may have expenses that have yet to be submitted to the Debtor for reimbursement.  As such, the Debtor seeks authorization to pay all Reimbursement Obligations in the ordinary course of business, including those incurred prior to the Petition Date, and to continue its policies relating to the Reimbursement Obligations.

23.     All prepetition Reimbursement Obligations were incurred by Employees within the scope of their employment by the Debtor with the understanding that they would be reimbursed for such expenses.   To avoid harming the Employees who incurred the Reimbursement Obligations on behalf of the Debtor, the Debtor requests the authority to reimburse any Employee for Reimbursement Obligations that may have been incurred prepetition including, as applicable, both payments to Chase and the reimbursement of Employees for all unpaid Reimbursement Obligations that were incurred prepetition or relate to the prepetition period.  The Debtor also seeks the authority to continue the use of the Chase Cards in the ordinary course of business, and to reimburse Employees for any expenses incurred in the ordinary course of business.

24.     <u>Employee Incentive Programs</u>.    The Debtor offers certain bonus programs

(collectively, the "**Employee Incentive Programs**"), through Dynegy, as an additional component of the Debtor's compensation structure.  The Employee Incentive Programs are designed to compensate the Employees for achieving certain performance goals or to recognize special achievements.

a. *Short-Term Incentives*.  Eligible Salaried Employees of the Debtor (each such Employee, a "**Participant**") participate in the Dynegy Inc. Incentive Compensation Plan (the "**STI Plan**").  Participants who are employed on the last day of a calendar year (a "**Performance Period**") have an opportunity to receive an award ("**STI**"), generally payable as a lump sum cash payment in March of the year following the Performance Period, for the Performance Period if certain performance goals and objectives are achieved during the Performance Period. A Participant is generally eligible to receive an STI award based on his or her established STI target, eligible base pay, performance and the level of funding of the total "**Bonus Pool**" for the Performance Period.  Funding of the Bonus Pool is generally determined based on financial and/or non-financial performance objectives.  The Compensation and Human Resources Committee of the Board of Directors of Dynegy (the "**Compensation Committee**") has the sole discretion to determine at what level a Bonus Pool will be funded for a Performance Period and the payment amount, if any, to be paid to Participants under this plan.  For the 2015 Performance Period, the aggregate STI payment for eligible Salaried Employees of the Debtor was $811,688.70.  Such payments are made directly by the Debtor to eligible Employees.

b. *Long-Term Incentives/Equity and Equity-Based Awards*.  Dynegy maintains the Amended and Restated 2012 Long Term Incentive Plan (the "**LTI Plan**") and the Dynegy Inc. 2009 Phantom Stock Plan (the "**Phantom Plan**"), under which the Debtor is a participating employer and under which prior equity awards have been granted, and may be granted going forward, to Salaried Employees under the LTI Plan and Union Employees under the Phantom Plan.  Specifically, 43 Salaried Employees have been granted and have outstanding awards of "Restricted Stock" units and/or "Performance Awards" under the LTI Plan, with a total of about 27,716 outstanding units that are generally anticipated to vest and be paid no sooner than March 2017 (based on the awards' vesting schedules).  Such awards under the LTI Plan are awarded to Employees by Dynegy and Dynegy is reimbursed by the Debtor.  Union Employees have been granted and have outstanding awards of "Phantom Stock Units" under the Phantom Plan, with a total of about 15,597 outstanding units that are generally anticipated to vest and be paid no sooner than March 2017 (based on the awards' vesting schedules).  Vesting and other terms and conditions of these phantom stock unit awards are governed by the award agreements and the Phantom Plan.

c. *Other Bonuses and Awards*.  Other types of bonuses and awards are also periodically granted to certain Employees to recognize special achievements,

US-DOCS\72869979.12

including "At Your Best", "One Team – One Goal", "Inspired Energy Award Program," and "Service Recognition Award Program" (collectively, the "**Other Bonus Programs**").  The "At Your Best" award program allow managers and supervisors to provide on-the-spot recognition to Employees for performance that goes above and beyond day-to-day expectations.  The One Team – One Goal award is designed to allow managers to recognize employees and teams that have demonstrated exemplary performance or made significant contributions on a specific activity or the successful completion of a critical project that contributes to the broader priorities of the group or overall organizational objectives.  The Inspired Energy award provides an annual forum for nominating and recognizing fellow employees who demonstrate the company's values and Inspired Energy concepts at work and in their personal lives.  The Debtor has a service award program to express the organization's appreciation for individual contributions at targeted time intervals.  Individuals employed by the Debtor (or a predecessor company) for 5, 10, 15, 20, 25, 30, 35, 40 or 45 years will receive the award.  The recipient will receive a service award package containing a Debit MasterCard. Amounts paid with respect to the Other Bonus Programs are paid directly by the Debtor.  On average, the Debtor pays approximately $1,050 per month on account of the Other Bonus Programs.  As of the Petition Date, there are no amounts outstanding with respect to the Other Bonus Programs.

25.     The Debtor paid approximately $1,102,927.25 on account of the Employee Incentive Programs during the twelve months prior to the Petition Date.  As of the Petition Date, accrued and unpaid amounts under the Employee Incentive Programs total approximately $1,109,975.71.[7]  The Employee Incentive Programs are not retention or severance plans as contemplated by Section 503(c) of the Bankruptcy Code.  The Debtor does not seek, under this Motion, the authority to make any payments under the Employee Incentive Programs other than to continue the Other Bonus Programs in the ordinary course of business.  Based on the expected timeline of this Chapter 11 Case, the Debtor hopes to emerge from Chapter 11 prior to payments under the STI Plan, LTI Plan, or Phantom Plan becoming due and payable to any of the Debtor's Employees.  The Debtor reserves its right to seek to make payments under the Employee Incentive Programs by a subsequent motion if it becomes apparent that the Debtor may not emerge from Chapter 11 on the expected timeline.

---

[7]     This amount is based on Dynegy's market close price as of December 2, 2016.

B.    **Employee Benefit Plan Obligations**

26.    In the ordinary course of business, the Debtor has established various benefit plans and policies for its Employees which can be divided into the following categories: (i) medical insurance, dental insurance, and vision care (collectively, the "**Health Plans**"); (ii) basic life and accidental death and dismemberment insurance, long-term disability insurance, and travel insurance (collectively, the "**Welfare Plans**" and together with the Health Plans, the "**Health and Welfare Plans**"); (iii) paid time off plans, including vacation and sick days, and certain Leave policies (collectively, the "**PTO Plans**"); (iv) the Dynegy 401(k) plan (the "**401(k) Plan**"); (v) the Dynegy Inc. Retirement Plan (the "**Pension Plan**"); (vi) the Newton Retiree Medical Plan (as defined below); (vii) the Severance Plans (as defined below); and (viii) certain other benefits programs including a retiree medical savings plan, a tuition reimbursement plan, an adoption assistance plan, and a flexible spending plan (the "**Other Benefits Programs**" and together with the Health and Welfare Plans, PTO Plans, the 401(k) Plan, the Pension Plan, the Newton Retiree Medical Plan, and the Severance Plans, the "**Employee Benefit Plans**").  In certain instances, the Debtor deducts specified amounts from the Employees' wages in connection with the Employee Benefit Plans, such as, among others, the Health Plans and the 401(k) Plan.  All obligations with respect to the Employee Benefit Plans (including insurance policies and coverage) are hereinafter referred to as the "**Employee Benefit Obligations**," which include the obligations arising under the various Employee Benefit Plans described below.

27.    With respect to many of the Employee Benefit Plans, the Debtor is a participant in programs maintained by the Provider Group.  As a result, many of the Employee Benefit Obligations are owed to the Provider Group.  The Debtor does not seek the authority to pay any amounts owed to the Provider Group on account of the Employee Benefit Obligations as of the Petition Date.  The Debtor does seek the authority to pay amounts owed as of the Petition Date

12

on account of the Employee Benefit Obligations that are not paid through the Services Agreement but are instead paid to non-affiliate third parties (collectively, the "**Non-Affiliate Benefit Obligations**").  The Debtor also seeks the authority to continue to make postpetition payments with respect to all Employee Benefit Obligations in the ordinary course of business.

28.     The majority of the Employee Benefit Obligations are paid in advance each month.  As of the Petition Date, the Debtor believes that the accrued and unpaid prepetition Non-Affiliate Benefit Obligations, excluding Employee contributions, is approximately $9,747.85.[8] Employee contributions that have already been deducted from employee wages with respect to Non-Affiliate Benefit Obligations, but have not yet been transmitted to the appropriate third party, total approximately $305,453.52.

29.     Health and Welfare Plans.  The Debtor provides its Employees with a standard range of Health and Welfare Plans.  Participants in the Health and Welfare Plans include the Debtor's Employees and their eligible dependents.  An Employee's eligibility to participate in the Health and Welfare Plans is determined by his or her union or salaried status, as well as the duration of the Employee's employment.

30.     *Health Plans*.  The Debtor offers several health and welfare programs to both the Union Employees and Salaried Employees, including medical, prescription drug, dental and vision care coverage, whether through third party insurers or otherwise (the "**Health Care Benefits**").

    a.  Salaried Employee Health Care Benefits.  Salaried Employees are provided Health Care Benefits through the Provider Group.  Health Care Benefits are provided to Salaried Employees through self-insured programs administered by

---

[8]     This calculation does not include PTO Obligations as any such accrued PTO Obligations do not represent a current cash pay obligation.

third parties, such as BlueCross Blue Shield of Illinois ("**BCBS**"), which administers the medical program; Express Scripts, which administers the prescription drug coverage; and Delta Dental, which administers the dental program.[9]  Vision coverage is fully insured and provided by VSP.  The Debtor funds these programs as claims are received and, on average, pays 80% of all medical premiums incurred by Salaried Employees as well as from 50-100% of all dental costs incurred by Salaried Employees, depending on the dental services. Vision premiums are fully Employee paid.

b.  <u>Newton Union Employee Health Care Benefits</u>.  Pursuant to the Newton CBAs, effective January 1, 2016, the Newton Union Employees participate in the Family Medical Care Plan 16 ("**FMCP 16**") for medical, prescription drug, dental, and vision coverage.[10]  The Debtor subsidizes each Newton Union Employee's premiums, paying 75% of medical premiums, 50% of dental premiums, and 0% of vision premiums.  Each Newton Union Employee is responsible for payment of the remainder of the premiums through payroll deduction.  The Newton CBAs provide that the Debtor will accept up to a maximum increase of 3.5% in 2017 and 3.5% in 2018 to the medical and dental subsidy dollar amounts in the event of potential increases to premiums required under the FMCP 16.  Under the FMCP

---

[9]   A self-insured group health plan (also called a self-funded plan) is one in which the employer (or in this case the employer's affiliate, Dynegy) assumes the financial risk for providing health care benefits to its employees by generally paying claims out-of-pocket rather than paying a fixed premium to an insurance carrier. As is common in these types of arrangements, Dynegy has purchased stop-loss coverage to limit its exposure under its self-insured medical program.  An employer often contracts with a third party administrator to administer self-insured group health plans, as has been done for the medical, prescription drug and dental coverage by contracting with BCBS, Express Scripts, and Delta Dental, respectively.  By contracting with a third party administrator such as BCBS, Dynegy is able to provide its employees with access to the BCBS network of healthcare providers and get the benefit of the discounted provider rates negotiated by BCBS for healthcare services provided to covered employees.

[10]   The FMCP 16 is a multi-employer plan sponsored by the International Brotherhood of Electrical Workers. The Debtor makes contributions to the FMCP 16 and withholds the Employees' contributions and transfers them to the FMCP 16 on the Employees' behalf.  Dynegy does not sponsor or otherwise participate in the FMCP 16.

14

16, medical benefits are provided by Anthem Blue Cross Blue Shield, dental benefits are provided by MetLife, vision benefits are provided by VSP, and prescription drug benefits are provided by Sav-Rx.  On average, the Debtor pays approximately $110,253.20 per month for FMCP 16 Health Care Benefits, in addition to approximately $39,562.99 which is contributed by the Newton Union Employees.  The Debtor does not pay administrative fees in connection with the Health Care Benefits provided by FMCP 16 as the FMCP 16 is wholly union administered.  As of the Petition Date, the Debtor estimates the amount of accrued and outstanding prepetition obligations with respect to FMCP 16 Health Care Benefits (the "**FMCP 16 Obligations**"), which the Debtor seeks authority to pay by this Motion, to be approximately $13,245.75.

      c.   <u>Coffeen Union Employee Health Care Benefits</u>.  Pursuant to the Coffeen CBA, the Coffeen Union Employees receive the same Health Care Benefits as the Salaried Employees.

31.    By this Motion, the Debtor seeks authority, but not direction, to (a) continue to provide the Health Care Benefits for all of its Employees in the ordinary course of business, (b) continue to honor obligations under such Health Care Benefits, including any premiums and administrative fees related thereto, and (c) pay the FMCP 16 Obligations that remain unpaid as of the Petition Date.

32.    *Welfare Plans*.  The Debtor provides primary life and accidental death and dismemberment insurance coverage for all eligible Salaried Employees and Coffeen Union Employees through Prudential at no cost to the Employees (the "**Life and AD&D Insurance**").  The Life and AD&D Insurance coverage is provided through the Provider Group.  The Debtor

does not seek to make any payments on account of prepetition amounts owed under the Services Agreement, but seeks to make postpetition payments to the Provider Group that will cover the cost of the Life and AD&D Insurance in the ordinary course of business.

33.     The Debtor provides eligible Employees, including both Union Employees and Salaried Employees, with fully insured long-term disability coverage through Prudential at no cost to the Employees (the "**Long-Term Disability Program**").   This coverage generally provides an eligible Employee up to 40% for Salaried Employees and 60% for Union Employees of his or her pre-disability base pay, up to a maximum benefit of $25,000 per month if the Employee becomes totally disabled for longer than 90 days.  The Long-Term Disability Program coverage is provided through the Provider Group.   The Debtor does not seek to make any payments on account of prepetition amounts owed under the Services Agreement, but seeks to make postpetition payments to the Provider Group that will cover the cost of the Long-Term Disability Program in the ordinary course of business.

34.     The Debtor provides eligible Salaried Employees and Coffeen Union Employees with business travel accident insurance through Zurich at no cost to the Employees (the "**BTA Program**").  BTA Program coverage is generally equal to six (6) times an Employee's eligible base pay, up to a maximum of $2,000,000, if an Employee dies or suffers certain physical losses due to an accident while traveling on company business.   The BTA Program coverage is provided through the Provider Group.   The Debtor does not seek to make any payments on account of prepetition amounts owed under the Services Agreement, but seeks to make postpetition payments to the Provider Group that will cover the cost of the BTA Program in the ordinary course of business.

35.     Paid Time Off Benefits.  Employees are eligible, in certain circumstances, to

US-DOCS\72869979.12

receive their full wages for, among other things, vacation, personal days, and holidays (the "**PTO Obligations**").  The specifics of the PTO Obligations vary based upon whether the Employee is a Salaried Employee, a Newton Union Employee, or a Coffeen Union Employee.  The rate at which Employees earn paid vacation varies depending upon how long an Employee has been employed, and the segment of the Debtor's business in which the Employee works.

36.     The Debtor provides vacation time to its Employees as a paid time-off benefit (the "**Vacation Time**").  The amount of Vacation Time varies based on the amount of time the Employee has been employed by the Debtor and predecessors thereof and, with regard to Union Employees, is governed by the CBAs.  When used, Union Employees are generally paid for Vacation Time at their normal base rate of pay for eight (8) hours for each vacation day.  Union Employees generally cannot receive payment in cash in lieu of earned Vacation Time, except upon termination of their employment, pursuant to the CBAs or under applicable state law.  Salaried Employees are similarly paid for Vacation Time at their salaried rates for eight (8) hours for each vacation day.  Pursuant to the Vacation Time policy for Salaried Employees, up to 40 hours of accrued but unused Vacation Time may be carried over to the next calendar year.  In the event that business needs result in a Salaried Employee having more than 40 hours of accrued but unused Vacation Time, a Salaried Employee may request an exception to carry over more than 40 hours to the next calendar year.  At termination of employment, Salaried Employees are paid for any unused portion of their accrued Vacation Time.

37.     In the ordinary course of business, the Debtor provides sick leave ("**Sick Leave**") to certain of its Employees.  Under the Sick Leave policy, at the start of their employment, full-time Salaried Employees receive a bank of thirteen (13) weeks to be used for their own occasional or extended non-occupational injury or illness, or for pregnancy.  Salaried Employees

17

who qualify for Sick Leave are paid their regular base salaries during their leave periods.  If a disability lasts longer than thirteen (13) weeks, the Salaried Employee is not paid for any additional time and is placed on non-working status for pay purposes.  However, unused accrued Vacation Time can be utilized by a Salaried Employee in such instances.  Annually, Union Employees receive 100% of base pay for non-occupational related illness or injury for a number of hours per calendar year based on a number of factors including length of employment and the number of hours of Sick Leave used during the prior calendar year.  At the Debtor's discretion, paid sick time may be extended beyond a Union Employee's accrued sick time.

38.     The Debtor also generally provides eleven (11) paid holidays for eligible full-time Union Employees and offers additional compensation ("**Holiday Pay**") to Union Employees who work on holidays.  With respect to Union Employees, the day the paid holiday(s) is observed and the provisions governing Holiday Pay are governed by the CBAs and may vary based on the shift worked.  Full-time Salaried Employees are generally eligible for ten (10) paid holidays per year.

39.     All full-time Salaried Employees are eligible to receive benefits for eligible absences from work under certain leave policies ("**Leave**").  Leave includes eligible absences from work under the following policies:

>   a.   Under the "**Court Attendance and Jury Duty Policy**", a full-time Salaried Employee who either attends court or appears as a witness at a hearing at the Debtor's request, or who is subpoenaed to give testimony on behalf of the Debtor, is paid for time lost.  The eligible Salaried Employee is paid for the time which would have been worked on the Employee's regular schedule at the applicable base salary.  Additionally, Salaried Employees who are required to attend court for jury selection or service are paid at the Employee's base salary for time which the Employee would have worked.  Income received by the Salaried Employee from the court for jury duty is not offset against the Employee's regular pay. Union Employees serving on jury duty are eligible to receive a leave of absence for those days during their normal workweek when they are serving on jury duty.

If the jury rate paid for jury service is less than the Union Employee's normal daily rate of pay, the Debtor pays the difference.

b.  All full-time Salaried Employees are also eligible for "**Bereavement Leave**." In case of a death in the immediate family of an eligible Salaried Employee, the Employee is allowed up to three (3) days (twenty-four (24) work hours) of paid leave, at the Employee's regular salary.  Union Employees who have had at least six (6) months of continuous employment may be absent without loss of pay for up to five (5) working days per year because of a death in the family, with the amount of paid time off depending on the Employee's relationship to the deceased.  In addition, Union Employees who are requested by the family of a deceased Employee or deceased retired Employee to serve as an active pallbearer are permitted to be absent from their regularly scheduled shift on the day of the funeral without loss of pay.

c.  Under the "**Family Illness Leave Policy**," a bank of three (3) eight (8)-hour days per calendar year is available to all full-time Salaried Employees who are required to be absent from work to care for a sick or injured spouse, child or parent. Salaried Employees who qualify for Family Illness Leave are paid their regular salary.  Union Employees who have had at least six (6) months of continuous employment may be absent without loss of pay for up to sixteen hours, in certain circumstances, due to the hospitalization of a family member.

d.  Pursuant to the "**Maternity Leave Policy**," all full-time and part-time Salaried Employees who are birth mothers are entitled to paid maternity leave for up to twelve (12) weeks following the delivery of a child.  Benefits are paid as a percentage of base salary, ranging from one-hundred to fifty percent.  Under the "**New Parent Leave Policy**," Salaried Employee birth fathers and adoptive/foster parents are granted up to two (2) consecutive weeks of paid leave following the birth of a child of the Employee/father or the placement of a child under the age of six (6) with the Employee for adoption or foster care.  As with the Maternity Leave Policy, benefits are paid as a percentage of base salary, one-hundred percent for the first week of leave and fifty percent for the second week of leave.

e.  Pursuant to the "**Military Leave Policy**," full-time Salaried Employees who are members of the National Guard or Reserve Corps are allowed up to two (2) weeks of paid leave at the Employee's regular base salary for annual tour-of-duty or reserve training.  Upon the Salaried Employee's return to work, the Employee is required to remit the pay received from the military for the time period in which the Employee was paid by the Debtor.

40.  As of the Petition Date, the Debtor estimates that it has approximately $562,009.79 of earned but unpaid PTO Obligations under the PTO Plans.  This amount is not a current cash pay obligation, since Employees are only entitled to be paid for accrued and unused

19

vacation time, personal days and holidays (if payable by law) in the event they are terminated. Because the PTO Plans are essential features of the employment package provided to the Debtor's Employees, and failure to provide these benefits would harm Employee morale and encourage the premature departure of valuable Employees, the Debtor requests authority to honor all of its PTO Obligations as and when they come due in the ordinary course of business.

41.     401(k) Plan.  Prior to the Petition Date, and in the ordinary course of business, the Debtor was a participating employer in the 401(k) Plan.  The 401(k) Plan generally provides for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck.  Approximately 207 Employees, including both Union Employees and Salaried Employees, currently participate in the 401(k) Plan, and they contributed approximately $2,474,811.96 of their own funds into the 401(k) Plan during the twelve months prior to the Petition Date.  The Debtor also makes certain "matching" contributions to the 401(k) Plan for certain participating Employees.  Matching contributions made on behalf of the Debtor's Employees during the twelve months prior to the Petition Date to the 401(k) Plan were approximately $963,050.87.  By this Motion, the Debtor seeks authority to pay all amounts owed under the 401(k) Plan and to continue to perform its obligations under the 401(k) Plan.  The Debtor estimates that there are no amounts outstanding as of the Petition Date on account of the 401(k) Plan.

42.     The 401(k) Plan is administered by the Provider Group and administrative fees in connection with the 401(k) Plan are paid indirectly by the Debtor through the Services Agreement.  The Debtor does not seek to make any payments on account of prepetition amounts owed under the Services Agreement.

43.     Pension Plan.  In addition to the 401(k) Plan, the Debtor is a participating

employer under certain Dynegy-sponsored pension plans for the benefit of its eligible Salaried Employees and Coffeen Union Employees, including the Pension Plan (specifically, the Portable Retirement Benefit under that plan).  On a quarterly basis, the Debtor evaluates whether and to what extent the Pension Plan is required to be funded with employer contributions.  The Debtor estimates that as of the Petition Date it has no outstanding obligations with respect to funding the Pension Plan.  Through this Motion, the Debtor seeks authority, but not direction, to continue to perform its obligations under the Pension Plan, including, but not limited to, the payment of any employer contributions to the Pension Plan in the ordinary course of business.  To the extent the Debtor has obligations under the Pension Plan, such obligations are Non-Affiliate Benefit Obligations.

44.     Newton Retiree Medical Plan.  In 2015, the Debtor made a one-time contribution of $1,000,000 to fund the Newton Energy Complex, Local 702 Employees Retiree Medical Benefits (the "**Newton Retiree Medical Plan**") for the benefit of certain Newton Union Employees.  Aside from the initial funding, the Debtor has no obligation to provide benefits for or fund the Newton Retiree Medical Plan.  Newton Union Employees who are eligible to participate in the Newton Retiree Medical Plan contribute a mandatory after-tax contribution of 2% of gross wages, which is transmitted directly by the Debtor to the Newton Retiree Medical Plan.  As of the Petition Date, the Debtor estimates that the amount withheld from Newton Union Employee wages that the Debtor seeks authority to transfer to the Newton Retiree Medical Plan (the "**Newton Retiree Medical Plan Obligations**") is approximately $10,955.94.

45.     Severance Plans and Obligations.  Prior to the Petition Date and in the ordinary course of business, the Debtor was a participating employer under the Dynegy Inc. Severance Plan (the "**Dynegy Severance Plan**"), which provides certain severance benefits for the Debtor's

21

eligible Salaried Employees.  The Salaried Employees covered under the Dynegy Severance Plan are "plant-level" employees and are not considered "insiders" of the Debtor.  Pursuant to the Dynegy Severance Plan, eligible Salaried Employees generally become eligible for severance payments and benefits if their employment is terminated due to a reduction in force, position elimination or office closing.  Benefits under the Dynegy Severance Plan generally include (i) a lump sum amount (which is determined based on factors, e.g., compensation and years of service, that vary under the different plans); (ii) in certain circumstances, an additional lump sum amount that is equivalent to or based on the STI Plan, and (iii) continued health coverage and outplacement benefits.  Receipt of benefits under the Dynegy Severance Plan is conditioned on an eligible Employee's timely execution of a claims release agreement.  Additionally, the CBAs provide for severance benefits upon termination of a Union Employee (the "**Union Severance Plans**" and together with the Dynegy Severance Plan, the "**Severance Plans**").  A Union Employee with one (1) or more completed years of service who is laid off is entitled to a lump sum payment based on a percentage of the Union Employee's base pay and based on the length of the Union Employee's service with the Debtor.  A Union Employee who is laid off is also provided a continuation of health care benefits at existing contribution levels for the shorter of 18 months or until the Union Employee obtains health insurance under another employer's insurance plan.  As of the Petition Date, the Debtor does not owe any former Employees on account of the Severance Plans.  By this Motion, the Debtor requests authority, in its sole discretion, to continue the Severance Plans and to provide any eligible Employee, who is not an insider (as that term is defined in the Bankruptcy Code), with severance benefits in the event such Employee is terminated postpetition.

46.     The Debtor believes that it is imperative that the prepetition Severance Plans be

permitted to continue postpetition.  Continuing the Severance Plans is necessary to preserve the goodwill and morale of current Employees.  The Debtor's current employees rely on the expectation that the Severance Plans will provide them with income protection in the event they are terminated without cause, and, as such, the Severance Plans represent a key component of the Debtor's retention effort that is critical to maintaining staffing essential to the ongoing operation of the Debtor's business.  The Debtor's business relies heavily on its Employees, and a failure to continue the Severance Plans would inevitably result in decreased Employee morale and confidence, consequences that could thwart the Debtor's efforts to maximize value during this Chapter 11 Case.

47.     <u>Workers' Compensation</u>.  Under the laws of Illinois, the Debtor is required to maintain workers' compensation policies and programs to provide its Employees with compensation for injuries arising from or related to their employment with the Debtor (the "**Workers' Compensation Programs**").  The Debtor's workforce is covered under a policy through Travelers under which Dynegy is the insured party.[11]  The Debtor pays premiums to Dynegy on a monthly basis determined based on employee headcount at each entity covered under the policy at the time of policy renewal.  The current policy runs from June 1, 2016 through June 1, 2017.  The Debtor pays approximately $59,191 in premiums on a monthly basis on account of such coverage, and is currently fully up to date on all premiums due as of the Petition Date under the Workers' Compensation Programs.

48.     As of the Petition Date, there were approximately seven (7) open workers' compensation claims (the "**Workers' Compensation Claims**") against the Debtor arising out of

---

[11]     In addition to the Travelers policy maintained by Dynegy, the Debtor paid an up-front annual premium of approximately $202,020 for the period from June 1, 2016 through June 1, 2017, for an owner controlled insurance program policy through Illinois National Insurance Company with respect to an installation project at the Newton Plant that has since been terminated.  As a result of this termination, the Debtor may be able to recover a portion of the up-front premium.

alleged injuries or death incurred by Employees during the course of their employment with the Debtor, which the Debtor expects to continue to resolve in the ordinary course of business.[12] Under the Travelers policy held by Dynegy, the Debtor is responsible for the first $500,000 of any workers' compensation claim filed by an employee of the Debtor.  Once the Debtor has paid this amount on an individual claim, the remainder of the cost is paid by Travelers.  In 2015, the Debtor paid approximately $380,000 on account of Workers' Compensation Claims, and as of the Petition Date, the Debtor has paid approximately $116,000 on account of Workers' Compensation Claims in 2016.  The Debtor pays a *de minimis* fee under the Travelers policy for each claim that is asserted thereunder.  The Debtor expects to continue to resolve any Workers' Compensation Claims in the ordinary course of business in accordance with applicable Illinois state law.

49.    Because the Workers' Compensation Programs are required for the continued operation of the Debtor's business under the laws of Illinois, the Debtor requests authority to pay any and all prepetition amounts due or that may become due with respect to the Workers' Compensation Programs. The Debtor further seeks authority to maintain and continue its prepetition practices with respect to the Workers' Compensation Programs, including, among other things, allowing workers' compensation claimants, to the extent they hold valid claims, to proceed with their claims under the applicable Workers' Compensation Programs.

50.    <u>Other Benefit Plans</u>.    The Employee Benefit Plans include a number of miscellaneous benefits that the Debtor provides to Employees (the "**Other Benefits Programs**"). By this Motion, the Debtor seeks authority, but not direction, to pay any outstanding prepetition

---

[12]    The Workers' Compensation Claims include claims under a previous policy, administered by Corporate Claims Management Inc. ("**CCMI**"), which the Debtor maintained prior to being acquired by Dynegy.  Claims under the CCMI policy that are currently considered "closed" could re-open if medical treatment on account of such claims becomes necessary.

24

obligations under the Other Benefits Programs, except to the extent that such obligations are owed to the Provider Group, and to continue these benefits postpetition. The Other Benefits Programs include, but are not limited to, the following:

    a.   <u>Flexible Spending Plan</u>. The Debtor provides eligible Employees with access to a dependent care flexible spending account (the "**Dependent Care FSA**"), administered by WageWorks. Employees may choose to make pre-tax contributions to fund the Dependent Care FSA during an annual election period. The Dependent Care FSA is intended to qualify as a dependent care assistance plan under Section 129 of the Internal Revenue Code. Currently, approximately 5 Employees use a Dependent Care FSA. The Debtor does not make contributions to any Employee's Dependent Care FSA but is obligated to transfer amounts deducted from Employees' paychecks on account of the Dependent Care FSAs. As of the Petition Date, the amount deducted from the Employees' wages in respect of the Dependent Care FSAs that the Debtor seeks authority to transfer to the Dependent Care FSAs (the "**Dependent Care FSA Obligations**") is approximately $523.06. Administrative fees of WageWorks in connection with the Dependent Care FSAs are paid indirectly by the Debtor through the Services Agreement.

    b.   <u>HSA</u>. The Debtor provides eligible Employees with access to a health savings account (the "**HSA**"), administered by HSA Bank, which may be used for incidental medical expenses. The Debtor funds the HSAs annually, usually on the first eligible payroll date of the plan year, in the amount of $600 for Employees with individual health coverage and $1,200 for Employees with family health coverage. The Debtor will contribute an additional $750 in 2017 for each Coffeen Union Employee, regardless of coverage level. Participating Employees also have the opportunity to make pre-tax contributions of a portion of their compensation to the HSA through payroll deduction to cover reimbursements under the program up to the maximum amount permitted by the IRS. Currently, approximately 121 Employees and 5 former Employees use HSAs. In the twelve months prior to the Petition Date, the Debtor contributed approximately $396,650.00 to fund the HSAs. As of the Petition Date, the amount that has been deducted from the Employees' wages in respect of the HSAs that the Debtor seeks authority to transfer to the HSAs (the "**HSA Obligations**") is approximately $290,476.62. Administrative fees of HSA Bank in connection with the HSAs are paid indirectly by the Debtor through the Services Agreement.

    c.   <u>Hospital Indemnity Plan</u>. The Debtor provides eligible Employees hospital indemnity insurance (the "**Hospital Indemnity Plan**") through Transamerica at no cost to the Employees. The Hospital Indemnity Plan pays Employees a specified amount in the event that they are confined to a hospital for a period of time. The Hospital Indemnity Plan coverage is provided through the Provider Group. The Debtor does not seek to make any payments on account of prepetition amounts owed under the Services Agreement, but seeks to make postpetition payments to the Provider Group that will cover the cost of the Hospital Indemnity Plan in the ordinary course of

business.

d. <u>Retiree Health and Life Insurance</u>.  Approximately 5 former employees of the Debtor continue to receive healthcare (e.g., medical, prescription drug, dental and vision coverage) and life insurance benefits (the "**Retiree Health and Life Insurance Program**") upon their retirement.  The Retiree Health and Life Insurance Program coverage is provided through the Provider Group.  The Debtor does not seek to make any payments on account of prepetition amounts owed under the Services Agreement, but seeks to make postpetition payments to the Provider Group that will cover the cost of the Retiree Health and Life Insurance Program in the ordinary course of business.

e. <u>Tuition Reimbursement Plan</u>.  The Debtor has a tuition reimbursement policy for eligible Employees for certain courses or degree programs in [engineering, computer/information technology, physics, mathematics, chemistry, business, and other similar programs] (the "**Tuition Reimbursement Plan**").  Under the Tuition Reimbursement Plan, Employees may receive up to $5,250.00 per year for undergraduate studies and up to $6,500.00 per year for graduate studies.  The Debtor paid approximately $1,416.31 on account of the Tuition Reimbursement Plan during the twelve months prior to the Petition Date.  As of the Petition Date, there are no accrued and unpaid amounts under the Tuition Reimbursement Plan but the Debtor seeks authority to continue the Tuition Reimbursement Plan postpetition.

f. <u>Employee Assistance Program</u>.  The Debtor provides eligible Union Employees and Salaried Employees and their eligible family members, at no cost to Employees, with an Employee Assistance Program through eni (the "**EAP**").  The EAP is a confidential counseling and referral service that can assist eligible Employees and their eligible dependents with a range of problems, such as grief or bereavement, family/parenting issues, anger management and similar issues.  The EAP coverage is provided through the Provider Group.  The Debtor does not seek to make any payments on account of prepetition amounts owed under the Services Agreement, but seeks to make postpetition payments to the Provider Group that will cover the cost of the EAP in the ordinary course of business.

## C. **Third Party Compensation**

51.     The Debtor requests authority to pay any expenses incident to, among other things, the Wage Obligations, Garnishment Obligations, Employer Payroll Tax Obligations, Reimbursement Obligations, and Employee Benefit Plans, including other processing costs or administration costs, other than those owed to the Provider Group ("**Prepetition Administration Costs**").  The Debtor estimates that there are no accrued but unpaid Prepetition Administration Costs as of the Petition Date because most administrative expenses related to the Debtor's

Employees are paid by the Debtor indirectly through the Services Agreement. To the extent there are any outstanding Prepetition Administration Costs as of the Petition Date, payment of such costs is justified because the failure to pay any such amounts might disrupt third party providers' services with respect to the Wage Obligations, Garnishment Obligations, Employer Payroll Tax Obligations, Reimbursement Obligations, and Employee Benefit Plans discussed herein.

### BASIS FOR RELIEF

**A.  Sufficient Cause Exists to Authorize the Debtor to Honor the Employee Obligations**

52.     The Court may authorize the Debtor's payment of the Employee Obligations under Section 363(b)(1) of the Bankruptcy Code. Section 363(b)(1) authorizes courts, after notice and a hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances."). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that Section 363(b) of the Bankruptcy Code requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *see also ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard. . . . The business judgment standard in section 363 is flexible and encourages discretion.").

53.     The relief requested herein is also supported by Section 105(a) of the Bankruptcy

27

Code, which empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("[I]t is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (recognizing that a bankruptcy court's use of its equitable powers under Section 105(a) of the Bankruptcy Code to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

54.     Courts in this Circuit and elsewhere have consistently held that under the "doctrine of necessity" and Section 105(a) of the Bankruptcy Code, the bankruptcy court can exercise its broad grant of equitable powers to authorize the payment of certain prepetition claims prior to the completion of the reorganization process when essential to the continued operation of the debtor's business. *See CoServ*, 273 B.R. at 497 (recognizing the "doctrine of necessity" in noting that payment of certain prepetition claims is appropriate where such payment is the "only means to effect a substantial enhancement of the estate"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2001) (holding that business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56, 60–61 (Bankr. N.D. Tex. 2004) (holding that payment of certain prepetition claims under the doctrine of necessity is "based on both common sense and the express provisions of the Bankruptcy Code"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004) (authorizing the debtors, in the business of generation and sale of electric power, to pay certain prepetition

claims because "the court d[id] not wish Debtors' businesses seriously damaged").

55.     The doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also CoServ*, 273 B.R. at 497.  Moreover, authorizing payment of prepetition claims is appropriate where, as in this Chapter 11 Case, such payment would not: (a) "effect a different priority scheme than the priorities established by Congress in the Bankruptcy Code"; or (b) "result in an unfair and impermissible discrimination among holders of general unsecured claims." *CEI Roofing*, 315 B.R. at 60.

56.     The Debtor believes that most of the Employee Obligations constitute priority claims under Sections 507(a)(4) and (5) of the Bankruptcy Code.  Pursuant to Section 507(a)(4)(A) of the Bankruptcy Code, Employee claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $12,850 per Employee.  Similarly, Section 507(a)(5) of the Bankruptcy Code provides that Employees' claims for contributions to certain employee benefit plans also are afforded priority unsecured status to the extent of $12,850 per Employee covered by such plan, less any amount paid pursuant to Section 507(a)(4). As priority claims, the Employee Obligations must be paid in full before any general unsecured obligations of the Debtor may be satisfied.  Accordingly, the relief requested herein may affect only the timing of the payment of these priority obligations and should not prejudice the rights of general unsecured creditors or other parties in interest.  Indeed, as of the Petition Date, the Debtor believes that no Employees are owed in excess of $12,850 on account of prepetition wages.

57.     Moreover, the Plan provides for the payment in full of all general unsecured

claims.  Thus, to the extent that any of the Employee Obligations is not a priority claim, if the Plan is confirmed then the relief requested herein would still only affect the timing of the payment of such claims and would not prejudice the rights of other general unsecured creditors whose claims would similarly be paid in full under the Plan.

58.     The relief requested in this Motion is necessary for the Debtor's business to continue to operate in the ordinary course of business to maximize value for all stakeholders. The Employees are vital to the success of the Chapter 11 Case.  The relief sought herein is entirely consistent with the intent of Section 105(a) of the Bankruptcy Code and the rehabilitative purpose of Chapter 11.  In this case, any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtor's relationship with its Employees at a time when the Employees' support is critical to this Chapter 11 Case and to the Debtor's restructuring efforts.  At this early stage, the Debtor simply cannot risk the substantial damage to its business that would inevitably result from a rapid decline in its Employees' morale.

59.     Absent the relief requested herein, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations.  Likewise, any interruption to the Employee benefits provided by the Debtor could have a material, negative effect on the physical well-being and morale of the Debtor's employees and their families.  Without the requested relief, the stability of the Debtor's business will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal and valuable Employees will seek other employment alternatives.  In addition, to the extent the Debtor owes Employees for business

expenses incurred prepetition, it would be inequitable to require the Debtor's Employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtor, with the understanding that they would be reimbursed.   Further, Employees could become concerned about personal liability for business charges, which could distract them from devoting attention to the Debtor's business.

60.     With respect to Employer Payroll Tax Obligations in particular, the payment of such taxes will not prejudice other creditors of the Debtor's estates, as the relevant Taxing Authorities generally would hold priority claims under Section 507(a)(8) of the Bankruptcy Code in respect of such obligations.   Moreover, the portion of the payroll taxes withheld from an Employee's wages on behalf of the applicable Taxing Authority is held in trust by ADP.   These Employee Withholding Taxes are not property of the Debtor's estate under Section 541 of the Bankruptcy Code.   *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estate).

61.     Similarly, state law requires the Debtor to maintain the Workers' Compensation Programs.   If the Debtor fails to maintain the Workers' Compensation Programs, state law may prohibit the Debtor from operating in Illinois.   Payment of all amounts relating to the Workers' Compensation Programs is therefore crucial to the Debtor's continued operations and the success of the Debtor's restructuring.

62.     In addition, the Debtor believes it is necessary to continue payment of administrative fees to the various vendors that administer the Debtor's Employee Obligations and related Employee Benefit Plans.   Without the continued services of these administrators, including, but not limited to, ADP, the Debtor will be unable to continue to honor its Employee Obligations and related Employee Benefit Plans in an efficient and cost-effective manner.

63.     The Debtor does not seek to alter its compensation, vacation, or other benefit policies at this time.  This Motion is intended only to permit the Debtor, in its discretion, to make payments consistent with the Debtor's existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtor, in its discretion, to continue to honor its practices, programs, and policies with respect to its Employees, as such practices, programs, and policies were in effect as of the Petition Date.  Consistent with prepetition practice, however, the Debtor requests authority to offer reasonable, ordinary course, cost of living wage increases to its Employees.  Payment of all Employee Obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor's estates, its creditors, and all parties in interest and will enable the Debtor to continue to operate its business in an economic and efficient manner, without disruption.  The Debtor's Employees are central to its operations and are vital to the Chapter 11 Case.

64.     In other chapter 11 cases, courts in this district have approved payment of prepetition claims similar to those described herein.  *See, e.g., In re Light Tower Rentals, Inc.,* No. 16-34284 (DRJ) (Bankr. S.D. Tex. Sep. 1, 2016); *In re Global Geophysical Servs.*, LLC, No. 16-20306 (DRJ) (Bankr. S.D. Tex. Aug. 5, 2016); *In re RAAM Global Energy Co.*, No. 15-35615 (MJI) (Bankr. S.D. Tex. Nov. 18, 2015); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MJI) (Bankr. S.D. Tex. Aug. 21, 2012); *In re ASARCO LLC*, No. 05-21207 (RSS) (Bankr. S.D. Tex. Aug. 10, 2005).[13]

---

[13]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.  Copies of these orders are available upon request to the Debtor's proposed counsel.

**B.** **A Limited Waiver of the Automatic Stay for Workers' Compensation Claims is Appropriate Here**

65.     Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

66.     Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1).  Cause exists here to modify the automatic stay to permit the Employees to proceed with Workers' Compensation Claims in the appropriate judicial or administrative forum. Staying the Workers' Compensation Claims could have a detrimental effect on the financial well-being and morale of the Employees.

**C.** **Cause Exists to Authorize the Debtor's Financial Institutions to Honor Checks and Electronic Fund Transfers**

67.     In furtherance of the relief requested herein, the Debtor requests that the Court authorize and direct the applicable banks and financial institutions (collectively, the "**Banks**") to receive, honor, process, and pay, to the extent of funds on deposit, any and all checks or electronic transfers requested or to be requested by the Debtor relating to the Employee Obligations, including those checks or electronic transfers that have not cleared the Banks as of the Petition Date, without the need for further Court approval.

68.     The Debtor also seeks authority to replace any prepetition checks or electronic transfers relating to the Employee Obligations that may be dishonored or rejected.  Each of the checks or electronic transfers can be readily identified as relating directly to the authorized payment of the Employee Obligations.  The Debtor believes that prepetition checks and

33

electronic transfers, other than those for Employee Obligations, or those authorized by another order of the Court, will not be honored inadvertently.  The Debtor also requests that the Banks be authorized and directed to rely on the representations of the Debtor as to which checks and electronic transfers are in payment of the Employee Obligations.

69.     Authorization to pay all amounts on account of prepetition Employee Obligations shall not be deemed to constitute postpetition assumption or adoption of any contract, program, or policy pursuant to Section 365 of the Bankruptcy Code.  The Debtor is in the process of reviewing these matters and reserves all of its rights under the Bankruptcy Code with respect thereto.   Moreover, authorization to pay all amounts in respect of prepetition Employee Obligations shall not affect the Debtor's right to contest the amount or validity of any Employee Obligation, including without limitation, the Payroll Tax Obligations that may be due to any Taxing Authority.

### THE DEBTOR HAS SATISFIED BANKRUPTCY RULE 6003(b)

70.     Certain aspects of the relief requested herein are subject to Bankruptcy Rule 6003. Pursuant to Bankruptcy Rule 6003, a court may grant such relief on an expedited basis if it is necessary to avoid immediate and irreparable harm.  The Debtor submits that the facts set forth herein and in the First Day Declaration demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtor and, thus, Bankruptcy Rule 6003 has been satisfied.

### WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

71.     To implement the foregoing immediately, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

72.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtor's or any other party in interest's rights to dispute any claim; (c) an assumption, adoption, or rejection of any agreement, contract, or lease under Section 365 of the Bankruptcy Code; (d) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; or (e) a waiver of any claims or causes of action which may exist against any entity.

## NOTICE

73.     The Debtor has provided notice of this Motion to (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the indenture trustee for the Debtor's prepetition senior unsecured notes; (c) counsel to the indenture trustee for the Debtor's prepetition senior unsecured notes; (d) counsel to the Ad Hoc Group of Noteholders; (e) counsel to Dynegy; (f) all secured creditors; (g) the Federal Energy Regulatory Commission, (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtor conducts business; (l) the state attorneys general for states in which the Debtor conducts business; (m) the International Brotherhood of Electrical Workers, Local 702; (n) the International Union of Operating Engineers, Local 148, AFL-CIO; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## **NO PRIOR APPLICATION**

74.     No prior request for the relief sought herein has been made to this Court or any

other court.

*[The remainder of this page intentionally left blank]*

36

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  December 9, 2016
        Houston, Texas

Respectfully Submitted,

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II (Texas Bar No. 240112503)
Robin Russell (Texas Bar No. 17424001)
Joseph W. Buoni (Texas Bar No. 24072009)
**ANDREWS KURTH KENYON LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Tel:  713-220-4200
Fax: 713-220-4285
Email:  TadDavidson@andrewskurth.com
        RRussell@andrewskurth.com
        JosephBuoni@andrewskurth.com

-and-

Caroline A. Reckler (*pro hac vice admission pending*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel:   312-876-7700
Fax:  312-993-9767
Email:  caroline.reckler@lw.com

-and-

Kimberly A. Posin (*pro hac vice admission pending*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue
Los Angeles, CA 90071
Tel:   213-485-1234
Fax:  213-891-8763
Email:  kim.posin@lw.com

*Proposed Co-Counsel for the Debtor and Debtor in Possession*

37