**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Case No. 16-_____ (___) |
| | § | |
| ILLINOIS POWER GENERATING COMPANY,[1] | § | Chapter 11 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |

## PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## OF ILLINOIS POWER GENERATING COMPANY

D. J. Baker (Texas Bar No. 01566500)
Caroline Reckler
Kimberly A. Posin
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY  10022-4834
Telephone: 212-906-1200
Facsimile: 212-751-4864

-and-

Timothy A. ("Tad") Davidson II (Texas Bar No. 240112503)
Robin Russell (Texas Bar No. 17424001)
Joseph W. Buoni (Texas Bar No. 24072009)
**ANDREWS KURTH KENYON LLP**
600 Travis, Suite 4200
Houston, TX 77002
Telephone:  713-220-4200
Facsimile:  713-220-4285

Co-Counsel for Debtor and Debtor-in-Possession

Dated:  November 7, 2016

---

[1]　　The Debtor in this chapter 11 case is Illinois Power Generating Company and the last four digits of its federal tax identification number are 5586.  The location of the Debtor's corporate headquarters and the Debtor's service address is:  601 Travis, Suite 1400, Houston, Texas 77002.

**TABLE OF CONTENTS**

ARTICLE I RULES OF CONSTRUCTION AND DEFINITIONS ......................................................... 1

1.1     Rules of Construction ......................................................................................................... 1
1.2     Definitions ......................................................................................................................... 1

ARTICLE II ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND STATUTORY FEES ................ 12

2.1     Administrative Claims ...................................................................................................... 12

ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS ....................................................... 12

3.1     Introduction ...................................................................................................................... 12
3.2     Summary of Classification and Treatment ....................................................................... 13
3.3     Unimpaired Classes of Claims and Interests ................................................................... 13
3.4     Impaired Class of Claims ................................................................................................. 14
3.5     Acceptance by an Impaired Class..................................................................................... 14
3.6     Presumed Acceptances by Unimpaired Classes ............................................................... 15
3.7     Confirmation Pursuant to Bankruptcy Code Section 1129(b) .......................................... 15
3.8     Subordinated Claims and Reservation of Rights Regarding Claims and Interests ........... 15

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ...................................................... 15

4.1     Continued Corporate Existence ........................................................................................ 15
4.2     Articles of Incorporation and By-laws .............................................................................. 15
4.3     Plan Distributions and Working Capital ........................................................................... 15
4.4     Cancellation of the Genco Notes and Agreements ........................................................... 17
4.5     Participation in Plan by Dynegy ...................................................................................... 17
4.6     Directors and Officers of Reorganized Genco .................................................................. 17
4.7     Revesting of Assets .......................................................................................................... 17
4.8     Indemnification of Debtor's Directors, Officers, and Employees; Insurance.................... 18
4.9     Exemption From Certain Transfer Taxes .......................................................................... 18
4.10    Corporate Action; Effectuating Documents ...................................................................... 18
4.11    Plan Supplement ............................................................................................................... 19
4.12    Indenture Trustee Fees and Expenses ............................................................................... 19
4.13    Preservation of Causes of Action ..................................................................................... 19
4.14    Guarantee of Dynegy Indebtedness .................................................................................. 19

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES, EMPLOYEE
BENEFITS AND INSURANCE POLICIES ................................................................................. 20

5.1     Assumed Contracts and Leases ......................................................................................... 20
5.2     Payments Related to Assumption of Contracts and Leases; Resolution of Assumption-Related
        Disputes ............................................................................................................................ 20
5.3     Rejected Contracts and Leases ......................................................................................... 21
5.4     Extension of Time to Assume or Reject ............................................................................ 21
5.5     Claims Arising from Assumption or Rejection ................................................................. 21
5.6     Reservation of Rights Regarding Executory Contracts and Unexpired Leases ................. 22
5.7     Restructuring Support Agreement and Related Agreements .............................................. 22
5.8     Compensation and Benefit Programs ................................................................................ 22
5.9     Insurance Policies ............................................................................................................. 23
5.10    Survival of the Debtor's Indemnification Obligations ...................................................... 23

US-DOCS\71982692.16

ARTICLE VI ........................................................................................................................... 24

SETTLEMENT, RELEASE, INJUCTION AND RELATED PROVISIONS ...................................... 24

6.1     Discharge of Claims ................................................................................................. 24
6.2     General Settlement of Claims and Interests .......................................................... 24
6.3     Release of Liens ...................................................................................................... 24
6.4     Releases .................................................................................................................. 24
6.5     Exculpation and Limitation of Liability ................................................................... 25
6.6     Injunction ................................................................................................................ 26

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ...................................................... 26

7.1     Distributions on Account of Claims Allowed as of the Effective Date .................... 26
7.2     Special Rules for Distributions to Holders of Disputed Claims .............................. 27
7.3     Disbursing Agent .................................................................................................... 27
7.4     Distributions on Account of Noteholder Claims ..................................................... 27
7.5     Delivery of Distributions ......................................................................................... 30
7.6     Calculation of Distribution Amounts of New Securities .......................................... 30
7.7     Minimum; *De Minimis* Distributions ...................................................................... 30
7.8     Section 4(a)(2) and Regulation S Exemptions ....................................................... 30
7.9     Undeliverable and Unclaimed Distributions .......................................................... 31
7.10    Determination of Allowability of Claims and Interests and Rights to Distributions ... 31
7.11    Timing of Distributions to Holders of Allowed Claims ........................................... 32
7.12    Application of Distribution Record Date .................................................................. 32
7.13    Withholding and Reporting Requirements .............................................................. 32
7.14    Setoffs ..................................................................................................................... 32
7.15    Prepayment ............................................................................................................. 32
7.16    Allocation of Distributions ...................................................................................... 33
7.17    Estimation of Claims ............................................................................................... 33

ARTICLE VIII CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN .................................................................................................................. 33

8.1     Conditions to Confirmation .................................................................................... 33
8.2     Conditions to Effective Date ................................................................................... 34
8.3     Waiver of Conditions .............................................................................................. 34
8.4     Effect of Failure of Conditions ................................................................................ 34

ARTICLE IX RETENTION OF JURISDICTION ......................................................................... 35

9.1     Scope of Retention of Jurisdiction ......................................................................... 35
9.2     Failure of the Bankruptcy Court to Exercise Jurisdiction ....................................... 36

ARTICLE X MISCELLANEOUS PROVISIONS ......................................................................... 36

10.1    Binding Effect and Successors and Assigns ............................................................ 36
10.2    Additional Documents ............................................................................................ 36
10.3    Professional Fee Claims .......................................................................................... 36
10.4    Fees and Expenses of Ad Hoc Group ...................................................................... 37
10.5    Releases and Satisfaction of Subordination Rights ................................................ 37
10.6    Special Provision Regarding Defined Benefit Pension Plans ................................... 37
10.7    No Impairment of Rights of Insurers and Sureties .................................................. 37
10.8    Term of Injunctions or Stays .................................................................................. 37
10.9    Entire Agreement ................................................................................................... 37
10.10   Exhibits ................................................................................................................... 38
10.11   Modifications and Amendments ............................................................................. 38

10.12    Severability of Plan Provisions ............................................................................................ 38
10.13    Revocation, Withdrawal, or Non-Consummation ................................................................. 38
10.14    Reservation of Rights .......................................................................................................... 38
10.15    Votes Solicited in Good Faith .............................................................................................. 39
10.16    Waiver or Estoppel .............................................................................................................. 39
10.17    Notices .................................................................................................................................. 39

Exhibit A        Term Sheet – New Dynegy Notes
Exhibit B        Term Sheet – New Dynegy Warrants
Exhibit C        Term Sheet – Genco Working Capital Facility

US-DOCS\71982692.16

## INTRODUCTION

Illinois Power Generating Company, as debtor and debtor in possession (the "<u>Debtor</u>"), hereby proposes this plan of reorganization (the "<u>Plan</u>").  Dynegy is a co-sponsor and co-proponent of the Plan and is participating in the Plan with the Debtor.  Reference is made to that certain Offering Memorandum and Indenture Consent Solicitation Statement and Disclosure Statement Soliciting Acceptances of a Prepackaged Plan of Reorganization distributed contemporaneously herewith (including all exhibits and schedules thereto, the "<u>Disclosure Statement</u>").

Holders of Claims should refer to the Disclosure Statement for a discussion of the Debtor's history, businesses, properties, results of operations, projections for future operations and risk factors, and a summary and analysis of the Plan and certain related matters.  Holders of Genco Notes should read the Disclosure Statement and Plan in their entirety before voting.

## ARTICLE I

## RULES OF CONSTRUCTION AND DEFINITIONS

**1.1**    **Rules of Construction**

**(a)**    For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms used in the Plan and not otherwise defined in the Plan shall have the meanings ascribed to them in Section 1.2 hereof.  Any capitalized term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**(b)**    Whenever the context requires, terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

**(c)**    Any reference in the Plan to (i) a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, or as otherwise specified in this Plan, and (ii) an existing document, exhibit, or other agreement means such document, exhibit, or other agreement as it may be amended, modified, or supplemented from time to time, and as in effect at any relevant point.

**(d)**    Unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan.

**(e)**    The words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan.

**(f)**    Captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

**(g)**    The rules of construction set forth in Bankruptcy Code Section 102 and in the Bankruptcy Rules shall apply.

**(h)**    References to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein shall, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection.

**(i)**    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**1.2**    **Definitions**

**(a)**    As used in the Plan, capitalized terms have the meanings as set forth below.

1.     "**Ad Hoc Group**" means the ad hoc group of certain Noteholders represented by the Ad Hoc Group Advisors.

2.     "**Ad Hoc Group Advisors**" means (i) Willkie Farr & Gallagher LLP, counsel to the Ad Hoc Group, and (ii) Houlihan Lokey Capital, Inc., financial advisor to the Ad Hoc Group.

3.     "**Administrative Claim**" means a Claim for costs and expenses of administration incurred on or after the Petition Date and on or prior to the Effective Date and entitled to priority pursuant to Bankruptcy Code Sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2), including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and on or prior to the Effective Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries or commissions for services, and payments for materials and other services); (ii) Professional Fee Claims; (iii) all fees and charges assessed against the Estate pursuant to Sections 1911 through 1930 of chapter 123 of the title 28 of the United States Code, 28 U.S.C. §§1-1401; (iv) the RSA Fee; (v) the fees and expenses of the Ad Hoc Group Advisors (subject to the terms of the applicable letter agreement); and (vi) Cure payments for contracts and leases that are assumed under Bankruptcy Code Section 365.

4.     "**Administrative Claims Bar Date**" means the date that is the 45th day after the Effective Date.

5.     "**Allowed**" means, with reference to any Claim or Interest, (i) a Claim or Interest (or a portion thereof) that is neither Disputed, contingent nor unliquidated, and, if filed with the Bankruptcy Court or Claims Agent, as to which the Debtor or any other party in interest has not filed an objection by the Claims Objection Deadline or such other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules or the Bankruptcy Court; (ii) a Claim or Interest that has been Allowed by a Final Order; (iii) a Claim or Interest that is Allowed (x) pursuant to the Plan, (y) in any stipulation that is approved by the Bankruptcy Court or (z) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (iv) a Claim relating to a rejected Executory Contract or Unexpired Lease that has been Allowed by a Final Order; (v) a Claim as to which a Proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Deadline; or (vi) any other Claim or Interest that has been allowed by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, a Claim that is Disputed is not an Allowed Claim.

6.     "**Ameren**" means Ameren Energy Generating Company, an Illinois corporation, now known as Illinois Power Generating Company.

7.     "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property of or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including Bankruptcy Code Sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a), or under similar or related state or federal statues and common law.

8.     "**Ballot**" means each of the ballot forms distributed to holders of Noteholder Claims for purposes of voting on the Plan, including any master ballots submitted to brokers, dealers, commercial banks, trust companies or other agent nominees of beneficial holders of Noteholder Claims.

9.     "**Bankruptcy Code**" means Sections 101 *et seq.*, of title 11 of the United States Code, as now in effect or hereafter amended and applicable to the Chapter 11 Case.

10.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court as may have jurisdiction over the Chapter 11 Case or any aspect thereof.

11.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and any local rules of the Bankruptcy Court, as now in effect or hereafter amended and applicable to the Chapter 11 Case.

US-DOCS\71982692.16

12.     "**Bar Date**" means any deadline for filing proof of a Claim that arose on or prior to the Petition Date, if any, as established by an order of the Bankruptcy Court or the Plan.

13.     "**Base Indenture**" means that certain Indenture, dated as of November 1, 2000, by and among Genco (formerly known as Ameren), as issuer, and the Indenture Trustee, which indenture governs all obligations arising under or in connection with the Genco Notes.

14.     "**Book-Entry Confirmation Procedure**" means part of the procedure that Noteholders will need to follow with respect to submission of Genco Notes after the Petition Date and prior to the Distribution Certification Deadline in order to obtain a distribution on account of Noteholder Claims under Section 7.4(b) hereof, which procedure will be fully described in the Eligibility Letter to be distributed by the Debtor following the Petition Date.

15.     "**Business Day**" means any day, except for Saturdays, Sundays, or "legal holidays" (as defined in Bankruptcy Rule 9006(a)).

16.     "**Cash**" means legal tender of the United States or equivalents thereof.

17.     "**Cash Consideration**" means $100,693,750 in Cash.

18.     "**Cause of Action**" means any action, claim (as defined in Bankruptcy Code Section 101(5)), cause of action, controversy, demand, right, debt, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, remedy, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to Bankruptcy Code Section 362 and any Avoidance Action; and (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in Bankruptcy Code Section 558.

19.     "**Chapter 11 Case**" means the voluntary case commenced under Chapter 11 of the Bankruptcy Code by the Debtor in the Bankruptcy Court.

20.     "**Claim**" means a claim (as such term is defined in Bankruptcy Code Section 101(5)) against the Debtor, whether or not asserted, known or unknown, arising before or after the Petition Date and specifically including an Administrative Claim.

21.     "**Claims Agent**" means Epiq Bankruptcy Solutions, LLC, or any other entity approved by the Bankruptcy Court to act as the Debtor's claims and noticing agent pursuant to 28 U.S.C. § 156(c).

22.     "**Claims Objection Deadline**" means the last day for filing objections to Claims in the Bankruptcy Court, which shall be the latest of (i) 120 days after the Effective Date, (ii) 120 days after a Proof of Claim has been filed with the Bankruptcy Court or Claims Agent if the Chapter 11 Case remains pending before the Bankruptcy Court, or (iii) such other later date as is established by order of the Bankruptcy Court upon motion of the Reorganized Debtor, without notice to any party.

23.     "**Class**" means a category of holders of Claims or Interests pursuant to Bankruptcy Code Section 1122(a), as described in Article II hereof.

24.     "**Confirmation**" means confirmation of the Plan by the Bankruptcy Court pursuant to Bankruptcy Code Section 1129.

25.     "**Confirmation Date**" means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

26.     "**Confirmation Hearing**" means the hearing to consider Confirmation of the Plan under Bankruptcy Code Section 1128, as such hearing may be adjourned or continued from time to time.

27.     "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code Section 1129.

28.     "**Consent Solicitation**" means the solicitation of consents on behalf of Genco from each Eligible Holder of the Genco Notes with respect to certain proposed amendments to the Genco Notes Indenture, as pursued pursuant to, and described in further detail in, the Disclosure Statement.

29.     "**Consenting Noteholders**" means the Noteholders who are party to the RSA (including through the execution of a joinder agreement thereto).

30.     "**Consummation**" means the occurrence of the Effective Date.

31.     "**Cure**" means, in connection with the assumption of an executory contract or unexpired lease, pursuant to and only to the extent required by Bankruptcy Code Section 365(b), (i) the distribution within a reasonable period of time following the Effective Date of Cash or such other property (A) as required under the terms of the applicable executory contract or lease, (B) other than as required under the terms of the applicable executory contract or lease, but as may be agreed upon by the counterparties and the Debtor, with the consent of Dynegy (which consent shall not be unreasonably withheld or delayed), or (C) as may be ordered by the Bankruptcy Court or determined in such manner as the Bankruptcy Court may specify; or (ii) the taking of such other actions (A) as required under the terms of the applicable executory contract or lease, (B) other than as required under the terms of the applicable executory contract or lease, but as may be agreed upon by the counterparties and the Debtor, with the consent of Dynegy (which consent shall not be unreasonably withheld or delayed), or (C) as may be ordered by the Bankruptcy Court or determined in such manner as the Bankruptcy Court may specify.

32.     "**D&O Insurance Policies**" means all insurance policies (including tail coverage insurance purchased on October 17, 2016) for directors', managers' and officers' liability maintained by the Debtor, or by Dynegy on behalf of the Debtor, as of the Petition Date or purchased on or before the Effective Date.

33.     "**Debtor**" means Illinois Power Generating Company (formerly known as Ameren), including in its capacity as a debtor in possession in the Chapter 11 Case pursuant to Bankruptcy Code Sections 1107 and 1108.

34.     "**Disallowed**" means a finding of the Bankruptcy Court in a Final Order or provision of the Plan providing that a Claim shall not be an Allowed Claim.

35.     "**Disbursing Agent**" means the Reorganized Debtor or any other Person(s) designated by (i) the Debtor on or before the Effective Date or (ii) the Reorganized Debtor in its sole discretion after the Effective Date to serve as a disbursing agent under the Plan, subject to the provisions of Section 7.3 hereof.

36.     "**Disclosure Statement**" has the meaning ascribed to it in the "Introduction" herein (as amended, supplemented, or otherwise modified from time to time with the consent of Dynegy and the Consenting Noteholders in accordance with the RSA, and that is prepared, approved and distributed in accordance with Bankruptcy Code Section 1125 and Bankruptcy Rule 3018).

37.     "**Disputed**" means (i) when used with respect to a Claim, that portion (including, when appropriate, the whole of such Claim) of (x) a Claim as to which (A) the Debtor or the Reorganized Debtor, as applicable, disputes its liability in accordance with applicable law or contract (including, without limitation, by declining to pay the Claim or by issuing a statement or other communication to the claimant or publicly that such Claim is disputed, including with respect to the status of such Claim as secured or unsecured), and (B) the liability of the Debtor has not been settled by the Debtor or by the Reorganized Debtor, or has not been determined, resolved, or adjudicated by Final Order; (y) as an alternative to the foregoing, a Claim as to which the Debtor or the Reorganized Debtor, as applicable, has elected to file an

objection or a motion for estimation in the Bankruptcy Court and such objection or a motion for estimation has not been settled or withdrawn by the Debtor or by the Reorganized Debtor, or has not been determined, resolved, or adjudicated by Final Order; or (z) a Claim that has been expressly disputed in the Plan; (ii) when used with respect to an Interest, an Interest that is in a name, kind and amount different than as set forth in the records of the Debtor; or (iii) when used with respect to a Claim or Interest, a Claim or Interest that is not yet Allowed; provided, however, that notwithstanding any of the foregoing, in no case shall a Noteholder Claim that is Allowed under the Plan or the RSA Fee be a Disputed Claim.

38.     "**Distribution Certification Deadline**" means the date that is five (5) Business Days before the date set for the commencement of the Confirmation Hearing, which date shall be set forth and noticed in an Eligibility Letter and the notice of the Confirmation Hearing.

39.     "**Distribution Record Date**" means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be for a Claim other than a Noteholder Claim, the Business Day immediately following the Confirmation Date, at 5:00 p.m. prevailing Eastern time on such Business Day or such other date as designated in an order of the Bankruptcy Court.

40.     "**DTC**" means The Depository Trust Company.

41.     "**DWAC**" has the meaning ascribed to it in Section 7.4(c) hereof.

42.     "**Dynegy**" means Dynegy Inc.

43.     "**Dynegy Common Stock**" means the common equity of Dynegy (NYSE: DYN).

44.     "**Early Consenting Noteholder**" means a Consenting Noteholder that became a party to the RSA on or before October 21, 2016.

45.     "**EEI Promissory Note**" means that certain $150 million Promissory Note, dated September 30, 2010 made to Ameren (now known as Genco) from Electric Energy, Inc., a direct subsidiary of Genco.

46.     "**Effective Date**" means the Business Day upon which all conditions to the consummation of the Plan as set forth in Section 8.2 hereof have been satisfied or waived as provided in Section 8.3 hereof and the Plan becomes effective.

47.     "**Eligibility Letter**" means a letter to be delivered by the beneficial holder of Noteholder Claims to the Reorganized Debtor or Disbursing Agent in which such holder, among other things, certifies that it is either an Eligible Holder or a Non-Eligible Holder, which will be distributed to Noteholders promptly following the Petition Date.

48.     "**Eligible Holder**" means a Noteholder that certifies to the reasonable satisfaction of Dynegy and Genco that it is: (i) for Noteholders located in the United States, a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) or an "Accredited Investor" (as defined in Rule 501 of the Securities Act); or (ii) for Noteholders located outside the United States, a person other than a "U.S. Person" (as defined in Rule 901(k) of the Securities Act).

49.     "**Eligible Holder Distribution**" means the sum of such Eligible Holder's Pro Rata share (across all Noteholder Claims) of: (i) the Cash Consideration, (ii) $210 million aggregate principal amount of New Dynegy Notes, and (iii) 10 million of New Dynegy Warrants.

50.     "**Eligible Institution**" means a member firm of a registered national securities exchange in the United States, a member of the National Association of Securities Dealers, Inc., or a commercial bank or trust company having an office or a correspondent in the United States.

51.     "**Employee Programs**" means all of the employee-related programs, plans, policies, and agreements that the Debtor participates in, including any such programs administered by Dynegy,

including, without limitation, (i) all health and welfare programs, plans, policies, and agreements, (ii) all pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, (iii) all supplemental retirement and deferred compensation programs, plans, policies, and agreements, (iv) all retiree benefit programs, plans, policies, and agreements subject to Bankruptcy Code Sections 1114 and 1129(a)(13), (v) all employment, retention, incentive, bonus, severance, change in control, and other similar programs, plans, policies, and agreements, and (vi) all other employee compensation, benefit, and reimbursement programs, plans, policies, and agreements.

52.     "**Entity**" means an entity as defined in Bankruptcy Code Section 101(15).

53.     "**Estate**" means the estate of the Debtor in the Chapter 11 Case, created pursuant to Bankruptcy Code Section 541.

54.     "**Equity Interests**" means any Interests in the Debtor that are based upon or arise from Genco Common Stock, together with any warrants, options, or contractual rights to purchase or acquire such securities at any time and all rights arising with respect thereto, in each case, that existed prior to the Effective Date, including any Unexercised Common Stock Rights; provided, however, that a Claim arising in respect of the Indemnification Obligations that is assumed under Section 6.5 hereof shall not be considered an Equity Interest.

55.     "**Exchange Offers**" means the out-of-court exchange offers and Consent Solicitation by Dynegy with respect to the Genco Notes to implement a restructuring of the Genco Notes, as pursued pursuant to, and described in further detail in, the Disclosure Statement.

56.     "**Exculpated Parties**" means, collectively, (i) Genco; (ii) Dynegy; (iii) the Consenting Noteholders; (iv) the Indenture Trustee; and (v) with respect to each of the foregoing entities in clauses (i) through (iv), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

57.     "**Final Distribution Date**" means the date that is one hundred and eighty (180) days following the Effective Date, as further described in Section 7.4(d) hereof.

58.     "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case, or the docket of any such other court, the operation or effect of which has not been stayed, reversed, or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing or leave to appeal has expired and as to which no appeal, petition for certiorari or petition for review or rehearing was filed or, if filed, remains pending or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing by all Persons or Entities possessing such right, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which reargument or rehearing was sought or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or state law may be filed with respect to such order shall not cause such order not to be a Final Order; provided, further, that the susceptibility of a Claim to a challenge under Bankruptcy Code Section 502(j) shall not cause such order not to be a Final Order.

59.     "**Genco**" means the Debtor or the Reorganized Debtor, as applicable.

60.     "**Genco Common Stock**" means, collectively, any common equity in Genco outstanding prior to the Effective Date.

61. "**General Unsecured Claim**" means a Claim that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Claim, an Intercompany Claim, or a Noteholder Claim.

62. "**Genco Notes**" means (i) the 7.00% Senior Notes, Series H, due 2018 issued by Genco (formerly known as Ameren); (ii) the 6.30% Senior Notes, Series I, due 2020 issued by Genco (formerly known as Ameren); and (iii) the 7.95% Senior Notes, Series F, due 2032 issued by Genco (formerly known as Ameren), each issued under the Genco Notes Indenture.

63. "**Genco Notes Indenture**" means the Base Indenture, as supplemented by the respective Supplemental Indentures.

64. "**Genco Working Capital Facility**" means a revolving credit facility that will provide for borrowings that will be provided to the Debtor by Dynegy pursuant to the Genco Working Capital Facility Credit Agreement, in accordance with the terms and conditions as substantially set forth in Exhibit C attached hereto.

65. "**Genco Working Capital Facility Credit Agreement**" means the credit agreement (and any related documents, agreements and instruments) governing the Genco Working Capital Facility, substantially in the form included in the Plan Supplement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

66. "**Governmental Unit**" has the meaning set forth in Bankruptcy Code Section 101(27).

67. "**Holdback Amount**" means the aggregate holdback of the Professional Fees billed to the Debtor during the Chapter 11 Case that are held back pursuant to the applicable order of the Bankruptcy Court.

68. "**Impaired**" means, with respect to any Class of Claims or Interests, that such Class of Claims or Interests is impaired within the meaning of Bankruptcy Code Section 1124.

69. "**Indemnification Obligation**" means any obligation of the Debtor to indemnify, reimburse, or provide contribution pursuant to by-laws, articles or certificates of incorporation, contracts, or otherwise, to the fullest extent permitted by applicable law.

70. "**Indenture Trustee**" means The Bank of New York or its successor, in any case in its capacity as an indenture trustee for the Genco Notes.

71. "**Indenture Trustee Fees and Expenses**" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims arising under the Genco Notes Indenture, including attorneys' and agents' fees, expenses and disbursements, incurred under the Genco Notes Indenture by the Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after the Effective Date.

72. "**Indenture Trustee's Charging Lien**" means any Lien or other priority to which the Indenture Trustee is entitled, pursuant to the Genco Notes Indenture, against distributions to be made to Noteholders.

73. "**Intercompany Claim**" means any Claim arising prior to the Petition Date against the Debtor by any of the Non-Debtor Subsidiaries.  For the avoidance of doubt, to the extent Allowed, any Claim arising prior to the Petition Date against the Debtor by any of the Non-Debtor Subsidiaries that is secured by a Lien on property in which the Estate has an interest constitutes a Secured Claim.

74. "**Interest**" means the legal, equitable, contractual ownership, or other rights of any Person to acquire or receive any of such Equity Interests.

75. "**Interim Distribution Date**" means the date that is seventy five (75) days following the Effective Date, as further described in Section 7.4(c) hereof

76.     "**IPM**" means Illinois Power Marketing Company (formerly known as Ameren Energy Marketing Company), an Illinois corporation and indirect, wholly-owned subsidiary of Dynegy.

77.     "**IPRG**" means Illinois Power Resources Generating, LLC (formerly known as Ameren Energy Resources Generating Company), an Delaware limited liability company and indirect, wholly-owned subsidiary of Dynegy.

78.     "**Lien**" means a lien as defined in Bankruptcy Code Section 101(37).

79.     "**Majority Consenting Noteholders**" means, as of the date of determination, at least two unaffiliated Consenting Noteholders who together hold, in the aggregate, at least 50.1% of the outstanding aggregate principal amount of Genco Notes held by all Consenting Noteholders as of such date.

80.     "**New Board**" means the board of directors of the Reorganized Debtor on and after the Effective Date.

81.     "**New Dynegy Notes**" means new senior unsecured notes in the aggregate principal amount of up to $210 million, to be issued by Dynegy under the New Indenture, substantially in accordance with the terms and conditions as set forth in Exhibit A attached hereto.

82.     "**New Dynegy Warrants**" means up to 10 million warrants to be issued by Dynegy pursuant to the New Warrant Agreement, substantially in accordance with the terms and conditions as set forth in Exhibit B attached hereto.

83.     "**New Genco By-laws**" means the by-laws of the Reorganized Debtor substantially in the form included in the Plan Supplement.

84.     "**New Genco Charter**" means the articles of incorporation of the Reorganized Debtor substantially in the form included in the Plan Supplement.

85.     "**New Genco Governing Documents**" means the New Genco Charter and the New Genco By-laws.

86.     "**New Indenture**" means the indenture, substantially in the form included in the Plan Supplement, under which Dynegy will issue the New Dynegy Notes.

87.     "**New Securities**" means, collectively, the New Dynegy Warrants and the New Dynegy Notes.

88.     "**New Warrant Agreement**" means that certain Warrant Agreement, substantially in the form included in the Plan Supplement, pursuant to which, on the Effective Date, Dynegy will issue the New Dynegy Warrants.

89.      "**Non-Debtor Subsidiaries**" means the Debtor's direct and indirect subsidiaries, consisting of Coffeen and Western Rail Road Company, Electric Energy, Inc., Midwest Electric Power, Inc., Joppa and Eastern Rail Road Company, and Met-South, Inc.

90.     "**Non-Eligible Holder**" means a Noteholder that certifies to the reasonable satisfaction of Dynegy and Genco that it is not: (i) a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act); (ii) an "Accredited Investor" (as defined in Rule 501 of the Securities Act); or (iii) a person other than a "U.S. Person" (as defined in Rule 901(k) of the Securities Act).

91.     "**Non-Eligible Holder Distribution**" means, with respect to each Non-Eligible Holder, Cash in an amount equal to the sum of: (i) the principal amount of New Dynegy Notes that such Non-Eligible Holder would receive under the Plan if it were an Eligible Holder, (ii) its Pro Rata share (across all Noteholder Claims) of $15 million (representing Dynegy's valuation (using a Black Scholes valuation as of the end of the Business Day prior to the date of the Disclosure Statement) of the New Dynegy Warrants

8

such Non-Eligible Holder would receive under the Plan if it were an Eligible Holder) and (iii) its Pro Rata share (across all Noteholder Claims) of the Cash Consideration.

92.      "**Noteholder**" means any holder of Genco Notes.

93.      "**Noteholder Claim**" means any Claim arising or existing under or related to the Genco Notes or the Genco Notes Indenture.

94.      "**Ordinary Course Professionals Order**" means any order of the Bankruptcy Court permitting the Debtor to retain certain professionals in the ordinary course of its business.

95.      "**Other Priority Claim**" means a Claim against the Debtor entitled to priority pursuant to Bankruptcy Code Section 507(a), other than a Priority Tax Claim or an Administrative Claim.

96.      "**Permitted Transferee**" means a Consenting Noteholder who became a Consenting Noteholder by executing and delivering a joinder agreement to the RSA pursuant to, and in accordance with the terms of Section 6 of the RSA.

97.      "**Person**" means any person, individual, firm, partnership, corporation, trust, association, company, limited liability company, joint stock company, joint venture, governmental unit, or other entity or enterprise.

98.      "**Petition Date**" means the date on which the Debtor commenced the Chapter 11 Case.

99.      "**Plan**" means this plan of reorganization under Chapter 11 of the Bankruptcy Code, and all implementing documents contained in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time with the consent of Dynegy and the Consenting Noteholders in accordance with the RSA.

100.      "**Plan Supplement**" means the supplement to the Plan (as may be amended, modified or supplemented), which is incorporated herein by reference and may be filed in parts pursuant to Section 5.15 hereof, containing, without limitation, (i) the announcement of any change in the name of the Reorganized Debtor, (ii) identification of the members of the New Board, (iii) the Schedule of Rejected Contracts and Leases, if any, and (iv) the Genco Working Capital Facility, the New Genco Governing Documents, the New Warrant Agreement, and the New Indenture, all of which documents set forth in clause (iv) hereof shall be in form reasonably satisfactory to Dynegy, the Debtor and the Consenting Noteholders in accordance with the RSA.

101.      "**Power Supply Agreement**" means that certain Amended and Restated Power Supply Agreement, dated March 28, 2008 by and between IPM (formerly known as Ameren Energy Marketing Company) and Genco (formerly known as Ameren) (as amended on January 1, 2010).

102.      "**Priority Tax Claim**" means a Claim that is entitled to priority pursuant to Bankruptcy Code Section 507(a)(8).

103.      "**Pro Rata**" means the proportion of the amount of an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class, unless the Plan provides otherwise.

104.      "**Professional**" means any professional (a) retained in the Chapter 11 Case by order of the Bankruptcy Court in connection with the Chapter 11 Case pursuant to Bankruptcy Code Sections 327, 328, 330, 363, or 1103 and to be compensated for services rendered prior to the Effective Date, pursuant to Bankruptcy Code Sections 327, 328, 329, 330, 331 and 363 or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to Bankruptcy Code Section 503(b)(4), in each case excluding the Ad Hoc Group Advisors and any of the Debtor's ordinary course professionals whose retentions are approved pursuant to the Ordinary Course Professionals Order.

105.    "**Professional Fee Claim**" means a Claim for professional services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date by a Professional, subject to the applicable order of the Bankruptcy Court, including, but not limited to, any order establishing procedures for interim compensation and the reimbursement of expenses of Professionals.

106.    "**Proof of Claim**" means a Proof of Claim filed with the Bankruptcy Court or the Claims Agent in connection with the Chapter 11 Case in accordance with the procedures established by the Bankruptcy Court.

107.    "**Qualified Permitted Transferee**" has the meaning ascribed to it in Section 5.7(b) hereof.

108.    "**Reinstated**" means (i) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim or Interest is entitled so as to leave such Claim or Interest unimpaired in accordance with Bankruptcy Code Section 1124; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (v) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365(b)(2), or of a kind that Section 365(b)(2) does not require to be cured, (w) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (x) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, (y) if such Claim or Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Bankruptcy Code Section 365(b)(1)(A), compensating the holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, and (z) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim or Interest is entitled; provided, however, that any Claim that is Reinstated under the Plan shall be subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

109.    "**Rejection Damages Claim**" means a Claim arising from the Debtor's rejection of a contract or lease, which Claim shall be limited in amount by any applicable provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code Section 502, subsection 502(b)(6) thereof with respect a Claim of a lessor for damages resulting from the rejection of a lease of real property, subsection 502(b)(7) thereof with respect to a Claim of an employee for damages resulting from the rejection of an employment contract, or any other subsection thereof .

110.    "**Released Parties**" means, collectively, (i) Genco; (ii) Dynegy; (iii) the Consenting Noteholders; (iv) the Indenture Trustee; and (v) with respect to each of the foregoing entities in clauses (i) through (iv), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

111.    "**Reorganized Debtor**" means the Debtor or its successor, by merger, consolidation or otherwise, on or after the Effective Date.

112.    "**RSA**" means that certain Restructuring Support Agreement, dated as of October 14, 2016 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof), between the Debtor, Dynegy and the Consenting Noteholders, including the Term Sheet attached thereto as Exhibit A, pursuant to which, among other things, and subject to certain terms and conditions, Dynegy and the Consenting Noteholders agreed to support the Plan.

113.    "**RSA Fee**" means $9,000,000 payable in accordance with the terms of the RSA.

114.      "**Schedule of Rejected Contracts and Leases**" means a schedule of the executory contracts and unexpired leases to be rejected, if any, pursuant to Bankruptcy Code Section 365 and Article V hereof.

115.      "**Secured Claim**" means a Claim (i) that is secured by a Lien on any asset of the Debtor in which the Estate has an interest, which Lien is valid, perfected, and enforceable under applicable law and not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or a Claim that is subject to a valid right of setoff; and (ii) to the extent of the value of the holder's interest in the collateral that secures payment of the Claim or in the Estate's interest in such property or to the extent of the amount subject to a valid right of setoff, as applicable.

116.      "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended.

117.      "**Shared Services Agreement**" means that certain Services Agreement, dated December 2, 2013, between Dynegy, certain Dynegy subsidiaries and Genco (as amended by that certain First Amendment to Services Agreement, dated January 20, 2014, that certain Second Amendment to Services Agreement, dated August 31, 2014, and that certain Third Amendment to Services Agreement, dated December 30, 2015).

118.      "**Supplemental Indentures**" means (i) that certain sixth supplemental indenture, dated as of July 7, 2008, between Genco (formerly known as Ameren) and the Indenture Trustee, pursuant to which the 7.00% Senior Notes, Series H, due 2018 were issued by Genco (formerly known as Ameren) under the Base Indenture, (ii) that certain seventh supplemental indenture, dated as of November 1, 2009, between Genco (formerly known as Ameren) and the Indenture Trustee, pursuant to which the 6.30% Senior Notes, Series I, due 2020 were issued by Genco (formerly known as Ameren) under the Base Indenture, and (iii) that certain fourth supplemental indenture, dated as of January 15, 2003, between Genco (formerly known as Ameren) and the Indenture Trustee, pursuant to which the 7.95% Senior Notes, Series F, due 2032 were issued by Genco (formerly known as Ameren) under the Base Indenture.

119.      "**Tax Sharing Agreement**" means that certain Tax Sharing Agreement, dated December 2, 2013, by and among Dynegy, Genco and its subsidiaries, and certain of Dynegy's other subsidiaries (as amended and restated on December 31, 2014).

120.      "**Transfer**" means to sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of, directly or indirectly, in whole or in part.

121.      "**Unclaimed Distribution**" means any distribution under the Plan on account of an Allowed Claim to a holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtor of an intent to accept a particular distribution; (c) responded to the Debtor's or Reorganized Debtor's request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

122.      "**Unexercised Common Stock Rights**" means, collectively, any stock options or other right to purchase any Genco Common Stock, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any such Genco Common Stock that have not been exercised prior to the Effective Date.

123.      "**Unimpaired**" means, with respect to any Class of Claims or Interests, that such Class of Claims or Interests is not impaired within the meaning of Bankruptcy Code Section 1124.

124.      "**Unreleased Dynegy Claims**" means any Claims and Causes of Action, including, but not limited to, any intercompany claim, if applicable, against the Debtor asserted by Dynegy or its affiliates (other than its affiliates that are Non-Debtor Subsidiaries), including, but not limited to, Claims and Causes of Action in connection with or arising out of the Shared Services Agreement, the Tax Sharing Agreement, and the Power Supply Agreement.

# ARTICLE II
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS AND STATUTORY FEES

In accordance with Bankruptcy Code Section 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

**2.1    Administrative Claims**

With respect to each Allowed Administrative Claim, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which such holder and the Debtor or the Reorganized Debtor, as applicable, shall have agreed upon in writing, either (i) on the Effective Date, (ii) if the Administrative Claim is not Allowed as of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date on which such Administrative Claim becomes an Allowed Claim,  or (iii) if the Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case, pursuant to terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the holders of such Allowed Administrative Claim.

       **(a)**       **Administrative Claims Bar Date**

Requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date, which shall be the 45th day after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtor or the Reorganized Debtor or its property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party no later than the 75th day after the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under this Plan.

       **(b)**       **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as shall have been determined by the Debtor or by the Reorganized Debtor, either (i) on or as soon as reasonably practicable after the Effective Date or the date on which such Priority Tax Claim becomes Allowed, Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in a manner consistent with Bankruptcy Code Section 1129(a)(9)(C), or (iii) such different treatment as to which such holder and the Debtor or the Reorganized Debtor, as applicable, shall have agreed upon in writing.

       **(c)**       **Payment of Statutory Fees**

All quarterly fees payable pursuant to Section 1930 of Title 28 of the United States Code prior to the Effective Date shall be paid by the Debtor on or before the Effective Date.  All such fees payable after the Effective Date shall be paid by the Reorganized Debtor as and when due, until such time as the Chapter 11 Case is closed, dismissed or converted.

# ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1    Introduction**

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the

US-DOCS\71982692.16

Effective Date.  A Claim or Interest may be and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

**3.2**     **Summary of Classification and Treatment**

| Class | Claims and Equity Interests | Status | Voting Rights |
|-------|------------------------------|--------|----------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Noteholder Claims | Impaired | Entitled to Vote |
| Class 6 | Equity Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

**3.3**     **Unimpaired Classes of Claims and Interests**

**(a)**     **Class 1:  Other Priority Claims**

Except to the extent that a holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, on or as soon as reasonably practicable after the Effective Date or the date on which such Other Priority Claim becomes Allowed, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, Cash equal to the unpaid portion of such Allowed Other Priority Claim.

Class 1 is Unimpaired under the Plan.  Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f).  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

**(b)**     **Class 2:  Secured Claims**

Except to the extent that a holder of an Allowed Secured Claim agrees in writing to less favorable treatment, on or as soon as reasonably practicable after the Effective Date or the date on which such Secured Claim becomes Allowed, each holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Claim, at the option of the Debtor or Reorganized Debtor, as applicable: (i) payment in Cash including the payment of any interest required to be paid under Bankruptcy Code Section 506(b); (ii) receipt of delivery of collateral securing any such Allowed Secured Claim; or (iii) treatment that otherwise renders the relevant holder of such Allowed Secured Claim Unimpaired.

Notwithstanding Bankruptcy Code Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of the Debtor held with respect to an Allowed Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Secured Claim until such Allowed Secured Claim is satisfied, at which time such Liens shall be released, shall be deemed null and void, and shall be unenforceable for all purposes.  Nothing in the Plan shall preclude the Debtor or the Reorganized Debtor from challenging the validity of any alleged Lien on any asset of the Debtor or the value of the property that secures any alleged Lien.

Class 2 is Unimpaired under the Plan.  Each holder of a Secured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f).  Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan.

(c)        **Class 3:  General Unsecured Claims**

Except to the extent that a holder of an Allowed General Unsecured Claim agrees in writing to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, on or as soon as reasonably practicable after the Effective Date or the date on which such General Unsecured Claim becomes Allowed, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, either: (i) Cash equal to the unpaid portion of such Allowed General Unsecured Claim; or (ii) treatment that otherwise renders such Allowed General Unsecured Claim Unimpaired.

Class 3 is Unimpaired under the Plan.  Each holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f).  Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(d)        **Class 4:  Intercompany Claims**

On or as soon as reasonably practicable after the Effective Date or the date on which such Intercompany Claim becomes Allowed, with respect to each Allowed Intercompany Claim, to the extent reasonably determined to be appropriate by Genco, Dynegy and the holder of such Allowed Intercompany Claim, either: (i) the legal, equitable and contractual rights of the holder of such Allowed Intercompany Claim shall be Reinstated as of the Effective Date; (ii) such Allowed Intercompany Claim shall be paid in Cash; or (iii) such Allowed Intercompany Claim shall receive treatment that otherwise renders such Allowed Intercompany Claim Unimpaired.

Class 4 is Unimpaired under the Plan.  Each holder of an Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f).  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

(e)        **Class 6: Equity Interests**

Each Allowed Equity Interest shall be Reinstated on the Effective Date.

Class 6 is Unimpaired under the Plan.  Each holder of an Equity Interest is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code Section 1126(f).  Therefore, holders of Equity Interests are not entitled to vote to accept or reject the Plan.

**3.4**        **Impaired Class of Claims**

(a)        **Class 5:  Noteholder Claims**

The Noteholder Claims shall be deemed Allowed in their entirety for all purposes of the Plan in the aggregate amount of $825,000,000, plus interest that accrued but remains unpaid as of the Petition Date, which Allowed Noteholder Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination, counterclaims, cross-claims, defenses, disallowance, impairments or any other challenges under applicable law or regulation by any entity.

Subject to Section 7.4, in full and final satisfaction, settlement, release, discharge of, in exchange for, and on account of each Allowed Noteholder Claim: (i) each Eligible Holder who participates with respect to its Genco Notes after the Petition Date (pursuant to Section 7.4 hereof and the Eligibility Letter instructions) shall receive its Eligible Holder Distribution and (ii) each Non-Eligible Holder who participates with respect to its Genco Notes after the Petition Date (pursuant to Section 7.4 hereof and the Eligibility Letter instructions) shall receive its Non-Eligible Holder Distribution.

Class 5 is Impaired under the Plan.  Each holder of an Allowed Noteholder Claim is entitled to vote to accept or reject the Plan.

**3.5**        **Acceptance by an Impaired Class**

In accordance with Bankruptcy Code Section 1126(c), and except as provided in Bankruptcy Code Section 1126(e), Class 5 - Noteholder Claims shall have accepted the Plan if the Plan is accepted by the holders of at least

two-thirds (2/3) in dollar amount and more than one-half (½) in number of Allowed Noteholder Claims of such Class that have timely and properly voted to accept or reject the Plan.

**3.6      Presumed Acceptances by Unimpaired Classes**

Claims in Classes 1, 2, 3, 4 and 6 are Unimpaired under the Plan.  Under Bankruptcy Code Section 1126(f), holders of such Unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of such Unimpaired Claim and Interest holders shall not be solicited.

**3.7      Confirmation Pursuant to Bankruptcy Code Section 1129(b)**

The Debtor reserves the right to alter, amend, or modify the Plan, or any document included in the Plan Supplement, with the consent of Dynegy and the Consenting Noteholders in accordance with the RSA, and in accordance with the provisions of the Plan, including, without limitation, Section 10.12, as necessary to satisfy the requirements of Bankruptcy Code Section 1129(b).

**3.8      Subordinated Claims and Reservation of Rights Regarding Claims and Interests**

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code Section 510(b), or otherwise.  Pursuant to Bankruptcy Code Section 510, the Debtor reserves the right to re-classify any Allowed Claim (other than Noteholder Claims) in accordance with any contractual, legal or equitable subordination rights relating thereto, including with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

<div align="center">

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

</div>

**4.1      Continued Corporate Existence**

The Reorganized Debtor shall continue to exist as of and after the Effective Date as a legal entity, in accordance with the applicable laws of the State of Illinois and pursuant to the New Genco Governing Documents. The Reorganized Debtor reserves the right to change its name, with any such name change to be mutually acceptable to the Debtor, to be announced in the Plan Supplement and to be effective upon the Effective Date.

**4.2      Articles of Incorporation and By-laws**

The articles of incorporation and by-laws of the Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Bankruptcy Code Section 1123(a)(6), a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Bankruptcy Code Section 1123(a)(6) and limited as necessary to facilitate compliance with applicable non-bankruptcy federal laws. The New Genco Governing Documents shall be in substantially the forms of such documents included in the Plan Supplement and shall be in full force and effect as of the Effective Date.

**4.3      Plan Distributions and Working Capital**

**(a)      Cash on Hand**

The Debtor will fund Cash distributions under the Plan with Cash on hand, including Cash from operations and the proceeds of the Genco Working Capital Facility.  From and after the Effective Date, the Reorganized Debtor, subject to any limitations set forth in the Genco Working Capital Facility or any other post-Effective Date financing arrangement, shall have the right and authority without further order of the Bankruptcy Court to raise additional or replacement capital and obtain additional or replacement financing as the board of directors of the Reorganized Debtor deems appropriate.

<div align="center">15</div>

(b)      **The Genco Working Capital Facility**

The post-Effective Date operations of the Reorganized Debtor shall be funded with Cash on hand, revenue from its continued operations, and proceeds of the Genco Working Capital Facility.  Without further notice to or order or other approval of the Bankruptcy Court (other than the Confirmation Order), act or action under applicable law, regulation, order or rule, the Reorganized Debtor shall be authorized to (i) enter into the Genco Working Capital Facility, (ii) grant any Liens and security interests and incur the indebtedness as required under, and in accordance with the terms and conditions of, the Genco Working Capital Facility, and (iii) issue, execute and deliver all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the Genco Working Capital Facility, with each of the foregoing being acceptable to Dynegy and the Majority Consenting Noteholders, and to take all other actions necessary to implement and effectuate borrowings under the Genco Working Capital Facility.  On the Effective Date, the Genco Working Capital Facility, together with new promissory notes, if any, evidencing obligations of the Reorganized Debtor thereunder, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective.  The new promissory notes issued pursuant to the Genco Working Capital Facility and all obligations under the Genco Working Capital Facility and related documents shall be paid as set forth in the Genco Working Capital Facility and related documents.

The Genco Working Capital Facility Credit Agreement shall constitute a legal, valid, binding and authorized obligation of the Reorganized Debtor, and shall be enforceable in accordance with its terms.  The financial accommodations to be extended thereunder are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Genco Working Capital Facility (i) shall be deemed to be approved, (ii) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Genco Working Capital Facility Credit Agreement, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Genco Working Capital Facility Credit Agreement, and (iv) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

Dynegy and the other persons or entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order).

Notwithstanding anything to the contrary in this Plan, the Bankruptcy Court shall have no jurisdiction over any matters first arising under the Genco Working Capital Facility after the Effective Date.

(c)      **Authorization and Issuance of the New Dynegy Notes**

On the Effective Date, Dynegy shall authorize the issuance of the New Dynegy Notes in the aggregate principal amount of up to $210 million for the benefit of Eligible Holders in accordance with the terms and conditions of the New Indenture.  The Debtor or the Reorganized Debtor, as applicable, shall use commercially reasonable efforts to cause the New Dynegy Notes to be represented by one or more global notes and to be issued in book-entry form through the facilities of DTC.  The issuance and distribution of the New Dynegy Notes pursuant to the Plan to Eligible Holders shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code Section 1145(a).

(d)        **Authorization and Issuance of the New Dynegy Warrants**

On the Effective Date, Dynegy shall authorize the issuance of the New Dynegy Warrants for the benefit of Eligible Holders in accordance with the terms and conditions of the New Warrant Agreement.  The issuance and distribution of the New Dynegy Warrants pursuant to the Plan to Eligible Holders shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code Section 1145(a).

**4.4        Cancellation of the Genco Notes and Agreements**

(a)        On the Effective Date, except as otherwise provided for herein, the Genco Notes shall be deemed extinguished, cancelled and of no further force or effect.

(b)        The obligations of the Debtor (and the Reorganized Debtor) under any agreements, indentures, or certificates of designations governing the Genco Notes and any other note, bond, or indenture evidencing or creating any indebtedness or obligation with respect to the Genco Notes shall be discharged in each case without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person; provided, however, that the Genco Notes and the Genco Notes Indenture shall continue in effect solely for the purposes of (i) allowing the holders of the Genco Notes to receive the distributions provided for Noteholder Claims hereunder; (ii) allowing the Disbursing Agent and the Indenture Trustee to make distributions on account of the Noteholder Claims; (iii) preserving the Indenture Trustee's rights to compensation and indemnification under the Genco Notes Indenture; (iv) permitting the Indenture Trustee to enforce its rights or any obligation owed to it under this Plan, including seeking compensation or reimbursement of fees and expenses in accordance with the terms of this Plan; (v) preserving the Indenture Trustee's Charging Lien; and (vi) permitting the Indenture Trustee to appear in the Chapter 11 Case or any proceeding in the Bankruptcy Court or any other court.

(c)        Subsequent to the performance by the Indenture Trustee or its agents of any duties that are required under the Plan, the Confirmation Order or under the terms of the Genco Notes Indenture, the Indenture Trustee and its agents (i) shall be relieved of, and released from, all obligations associated with the Genco Notes arising under the Genco Notes Indenture or under other applicable agreements or law and (ii) shall be deemed to be discharged.

**4.5        Participation in Plan by Dynegy**

(a)        Dynegy has agreed to be a sponsor of and participant in the Plan with the Debtor for purposes of (i) providing the Genco Working Capital Facility, including for purposes of payment of the Cash Consideration, Non-Eligible Holder Distributions and RSA Fee to the extent necessary, (ii) issuing the New Dynegy Notes and (iii) issuing the New Dynegy Warrants and consents to the jurisdiction of the Bankruptcy Court with respect to the foregoing.

(b)        As an affiliate of the Debtor which is participating in the Plan, Dynegy shall be deemed to be, and the Confirmation Order shall find that Dynegy is, an affiliate of the Debtor participating in a joint plan with the Debtor for purposes of Bankruptcy Code Section 1145.

**4.6        Directors and Officers of Reorganized Genco**

(a)        The initial members of the New Board will be disclosed in the Plan Supplement or otherwise on or before the Confirmation Date.  Upon and after the Effective Date,  the New Board shall serve in accordance with the New Genco Governing Documents.

(b)        The officers of Genco shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Debtor until replaced or removed in accordance with the New Genco Governing Documents, subject to applicable law.

**4.7        Revesting of Assets**

Except as otherwise provided herein, the property of the Debtor's Estate, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtor may operate its business and

US-DOCS\71982692.16

may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.  Except as specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests, and all Liens with respect thereto.

**4.8      Indemnification of Debtor's Directors, Officers, and Employees; Insurance**

(a)      Upon the Effective Date, the New Genco Governing Documents shall contain provisions, or the Reorganized Debtor shall enter into indemnification agreements, which, to the fullest extent permitted by applicable law, (i) eliminate the personal liability of the Debtor's directors, officers, and key employees serving before, on, and after the Petition Date and the Reorganized Debtor's directors, officers, and key employees serving on and after the Effective Date for monetary damages; and (ii) require the Reorganized Debtor, subject to appropriate procedures, to indemnify those of the Debtor's directors, officers, and key employees serving prior to, on, or after the Effective Date for all claims and actions, including, without limitation, for pre-Effective Date acts and occurrences.

(b)      The Debtor, and upon the Effective Date, the Reorganized Debtor, shall assume all of the D&O Insurance Policies maintained by Genco pursuant to Bankruptcy Code Section 365(a).  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Insurance Policies maintained by Genco without any modifications.

**4.9      Exemption From Certain Transfer Taxes**

Pursuant to Bankruptcy Code Section 1146(a), any transfers from the Debtor to the Reorganized Debtor or any other Person pursuant to, in contemplation of, or in connection with the Plan, including any Liens granted to secure the Genco Working Capital Facility, and the issuance, transfer, or exchange of any debt, equity securities or other interest under or in connection with the Plan, shall not be taxed under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or government assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement and all documents necessary to evidence and implement any of the transactions and actions described in the Plan or the Plan Supplement.

**4.10      Corporate Action; Effectuating Documents**

(a)      On the Effective Date, the adoption and filing of the New Genco Governing Documents and all actions contemplated by the Plan shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for herein or therein involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtor or the Reorganized Debtor, and shall be fully authorized pursuant to applicable state law.

(b)      Any chief executive officer, president, chief financial officer, senior vice president, vice president, general counsel, secretary or other appropriate officer of the Reorganized Debtor, shall be authorized to execute, deliver, file, or record the documents included in the Plan Supplement and such other contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Any secretary or assistant secretary of the Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.  All of the foregoing is authorized without the need for any required approvals, authorizations, or consents except for express consents required under the Plan.

**4.11     Plan Supplement**

The Plan Supplement may be filed in parts either contemporaneously with the filing of the Plan or from time to time thereafter, but in no event later than fourteen (14) days prior to the deadline established by the Bankruptcy Court for objecting to the Plan.  The Plan Supplement shall be incorporated into the Plan by reference and is a part of the Plan as if set forth in full herein.  After filing, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours.  The Plan Supplement is also available for inspection on (a) the website maintained by the Claims Agent: http://dm.epiq11.com/IPG, and (b) the Bankruptcy Court's website: http://ecf.txsb.uscourts.gov.  In addition, holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request in accordance with Section 10.17 hereof.

**4.12     Indenture Trustee Fees and Expenses**

On the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall pay in Cash all Indenture Trustee Fees and Expenses (which, for the avoidance of doubt, shall not reduce the Cash Consideration), without the need for the Indenture Trustee to file fee applications or any other applications with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtor shall pay in Cash all Indenture Trustee Fees and Expenses related to any services provided by the Indenture Trustee in connection with making disbursements to holders of Allowed Noteholder Claims.  Nothing in the Plan shall in any way affect or diminish the right of the Indenture Trustee to assert the Indenture Trustee's Charging Lien against any distribution to Noteholders with respect to any unpaid Indenture Trustee Fees and Expenses or other amounts payable to the Indenture Trustee under the Genco Notes Indenture.

**4.13     Preservation of Causes of Action**

Unless any Causes of Action against an Entity or Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, in accordance with Bankruptcy Code Section 1123(b), but subject to Article VI hereof, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No Entity or Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Reorganized Debtor will not pursue any and all available Causes of Action against them.

Unless any Causes of Action against an Entity or Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or the Effective Date.

**4.14     Guarantee of Dynegy Indebtedness**

Dynegy intends, on or after the Effective Date, to designate the Debtor and its wholly-owned subsidiary as guarantors of Dynegy's material, third-party indebtedness for borrowed money.  As of September 30, 2016, on a pro forma basis as described in the Disclosure Statement under "Dynegy Capitalization", Dynegy had $9.2 billion of material, third-party indebtedness for borrowed money, $2.6 billion of which was secured (which secured indebtedness will be secured by substantially all of the assets of the Debtor and such wholly-owned subsidiary in conjunction with the effectiveness of the guarantees).  The guarantees will contain language limiting the amount of the guarantee to the extent it constitutes a fraudulent transfer or conveyance and provide for contribution from or payments made by or on behalf of any other guarantor.

US-DOCS\71982692.16

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES,**
**EMPLOYEE BENEFITS AND INSURANCE POLICIES**

**5.1      Assumed Contracts and Leases**

(a)      Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Supplement, as of the Effective Date, the Debtor shall be deemed to have assumed each executory contract or unexpired lease to which the Debtor is a party as of the Petition Date unless any such contract or lease (i) was previously assumed or rejected upon motion by a Final Order, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by the Debtor on or before the Confirmation Date, or (iv) is subsequently rejected in accordance with the provisions of Section 5.3 hereof.

(b)      The Confirmation Order shall constitute an order of the Bankruptcy Court under Bankruptcy Code Section 365(a) approving the contract and lease assumptions described in Section 5.1(a) hereof, as of the Effective Date.   Each executory contract and unexpired lease assumed pursuant to this Section 5.1 shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.

(c)      Each executory contract and unexpired lease that is assumed shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such contract or lease and (ii) all contracts or leases appurtenant to the subject premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

(d)      To the extent applicable, all executory contracts or unexpired leases of the Debtor assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change in control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

(e)      Upon the Effective Date, the Power Supply Agreement shall be assumed and deemed amended to (A) provide that at any time during the term of the Power Supply Agreement, either party may elect to terminate the Power Supply Agreement by providing the other party with no less than six (6) months' advanced written notice of its desire to terminate the Power Supply Agreement and (B) if required by Dynegy and IPM, modify the Energy Charge (as defined in the Power Supply Agreement) and the Capacity Payment (as defined in the Power Supply Agreement) to eliminate any subsidy from IPM or IPRG to Genco under the Power Supply Agreement.

(f)      Upon the Effective Date, the Shared Services Agreement shall be assumed and deemed amended to provide that Dynegy and the other "Providers" (as defined in the Shared Services Agreement) may terminate the Shared Services Agreement for convenience with respect to one or more "Recipients" (as defined in the Shared Services Agreement) upon twelve (12) months' notice to such Recipients.

**5.2      Payments Related to Assumption of Contracts and Leases; Resolution of Assumption-Related Disputes**

(a)      Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under Bankruptcy Code Section 365(b)(1) by Cure.  The Debtor shall, at its option, be permitted to resolve any dispute with respect to the amount of Cure either (i) through the Bankruptcy Court, or (ii) in the procedural manner in which a dispute regarding the amounts owed under a particular executory contract and unexpired lease would have been settled, determined, resolved or adjudicated if the Chapter 11 Case had not been commenced.

(b)      If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of Bankruptcy

Code Section 365) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, Cure shall occur following the earlier of (y) the entry of a Final Order resolving the dispute and approving the assumption if such dispute is adjudicated in the Bankruptcy Court, or (z) as to disputed monetary amounts allegedly due under the executory contract or unexpired lease, following the final resolution of such matter if the Debtor elected to handle such dispute in the procedural manner in which it would have been settled, determined, resolved or adjudicated if the Chapter 11 Case had not been commenced.

(c)      Notwithstanding any of the foregoing subsections of this Section 5.2, the Debtor or the Reorganized Debtor, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the Debtor's Estate or the Reorganized Debtor. Such rejected contracts, if any, shall be listed on the Schedule of Rejected Contracts and Leases, which shall be filed with the Plan Supplement. In the event the Debtor so rejects any previously assumed contract or lease, and such rejection gives rise to a Rejection Damages Claim, such Rejection Damages Claim arising out of such rejection shall be limited to the amount of the Allowed Rejection Damage Claim.

(d)      Except as otherwise set forth in the Plan, assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption or assignment. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

## 5.3      Rejected Contracts and Leases

The Debtor reserves the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any executory contract or unexpired lease to which the Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease. Any executory contracts or unexpired leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtor. In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Reorganized Debtor no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 3 General Unsecured Claims.

## 5.4      Extension of Time to Assume or Reject

Notwithstanding anything otherwise set forth in the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the Debtor's right to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Section 5.1(a) hereof shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

## 5.5      Claims Arising from Assumption or Rejection

(a)      Except as otherwise provided in the Plan or by Final Order of the Bankruptcy Court, all (i) Allowed Claims arising from the assumption of any contract or lease shall be treated as Administrative Claims pursuant to Section 2.1(a) above; and (ii) Allowed Rejection Damages Claims shall be treated as General Unsecured

Claims pursuant to and in accordance with the terms of Section 3.3(c) above, except to the extent of any right of setoff and the amount of any security deposit held by the holder of such Allowed Rejection Damages Claim.

(b)      If the rejection by the Debtor, pursuant to the Plan or otherwise, of a contract or lease results in a Rejection Damages Claim, then such Rejection Damages Claim shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor or the properties of either of them unless a Proof of Claim is (i) filed with the Claims Agent on or before the date that is the first Business Day that is thirty (30) days after the Bankruptcy Court's entry of an order authorizing the rejection of a contract or lease and (ii) contemporaneously with such filing, served upon (a) if such filing occurs prior to the Effective Date, counsel to the Debtor or (b) if such filing occurs after the Effective Date, counsel to the Reorganized Debtor.  All rights of the Debtor or the Reorganized Debtor, as applicable, to object to any Rejection Damages Claim are reserved.

**5.6      Reservation of Rights Regarding Executory Contracts and Unexpired Leases**

(a)      Neither the exclusion nor inclusion of any contract or lease by the Debtor on any exhibit, schedule or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor or the Reorganized Debtor or their respective affiliates has any liability thereunder.

(b)      Nothing in the Plan will waive, excuse, limit, diminish or otherwise alter any of the defenses, Claims, Causes of Action or other rights of the Debtor and the Reorganized Debtor under any executory or non-executory contract or any unexpired or expired lease.

(c)      Nothing in the Plan will increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtor or the Reorganized Debtor under any executory or non-executory contract or any unexpired or expired lease.

**5.7      Restructuring Support Agreement and Related Agreements**

(a)      On the Effective Date, the Debtor shall assume and be deemed to assume the RSA pursuant to the Plan, including the obligation of the Debtor with respect to the RSA Fee.  On the Effective Date, if not previously assumed by the Debtor, the Debtor shall assume and be deemed to assume pursuant to the Plan (i) the letter agreement between the Debtor and Willkie Farr & Gallagher LLP, dated as of May 6, 2016, and (ii) the letter agreement between the Debtor and Houlihan Lokey Capital, Inc., dated as of June 1, 2016, and such agreements shall terminate on their terms as of the day following the Effective Date, unless otherwise agreed by the parties thereto.  Fees and expenses due and payable pursuant to the RSA or such letter agreements (including the RSA Fee and the fees and expenses of the Ad Hoc Group Advisors), subject to the terms and conditions thereof in all respects, as of the Effective Date, shall be an Allowed Administrative Claim under this Plan without any need to file a request for payment of such Administrative Claims.

(b)      Pursuant to the RSA, each Early Consenting Noteholder shall receive on the Effective Date its pro rata share of the RSA Fee in Cash, with such pro rata share determined as the proportion that the amount of Allowed Noteholder Claims held by such Early Consenting Noteholder on the Effective Date bears to the aggregate amount of all Allowed Noteholder Claims held by the Early Consenting Noteholders and Qualified Permitted Transferees; provided, that to the extent an Early Consenting Noteholder transfers any Allowed Noteholder Claims to a Permitted Transferee in accordance with the RSA prior to the Effective Date, such Permitted Transferee shall be entitled to receive on the Effective Date such Early Consenting Noteholder's pro rata share of the RSA Fee in respect of such transferred Allowed Noteholder Claims but not any other Allowed Noteholder Claims held by such Permitted Transferee (unless such Permitted Transferee was an Early Consenting Noteholder) (such Permitted Transferee, solely with respect to such transferred Allowed Noteholder Claims by an Early Consenting Noteholder, a "Qualified Permitted Transferee").

**5.8      Compensation and Benefit Programs**

(a)      Except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) previously terminated, all Employee Programs

22

administered by the Debtor in effect before the Effective Date, shall be deemed to be, and shall be treated as though they are, contracts that are assumed under the Plan.  Nothing contained herein shall be deemed to modify the existing terms of Employee Programs, including, without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.  As to any Employee Programs administered by Dynegy, nothing contained herein shall be deemed to modify the existing terms of such Employee Programs, including, without limitation, Dynegy's rights of termination and amendment thereunder.

(b)  To the extent any "change in control" provision contained in any Employee Program would be triggered and payable solely as a result of the transactions contemplated by the Plan, such Employee Program shall not be assumed to the extent a waiver of the change in control provision is not executed by the employee having the benefit of such change in control provision, but otherwise shall remain in full force and effect and may be triggered as a result of any transactions occurring after the Effective Date.

(c)  As of the Effective Date, any and all equity incentive plans, equity ownership plans, or any other equity-based plans entered into before the Effective Date, including Claims arising from any change in control provision therein, shall be deemed to be, and shall be treated as though they are, contracts that are assumed pursuant to Bankruptcy Code Section 365 under the Plan pursuant to the Confirmation Order, provided, however, that nothing contained herein will impact any Cash payment components of any such equity-based plans.

(d)  The Debtor further affirms and agrees that any discharge of liability provided under this Plan shall not operate to discharge any obligations it might have under applicable non-bankruptcy law with respect to any tax-qualified defined benefit pension plan maintained by Dynegy as a result of the Debtor's status as a member of the "controlled group" for such pension plan.

**5.9  Insurance Policies**

All insurance policies pursuant to which the Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtor and Reorganized Debtor and shall continue in full force and effect.  All other insurance policies shall revest in the Reorganized Debtor.

**5.10  Survival of the Debtor's Indemnification Obligations**

(a)  Any obligations of the Debtor pursuant to its corporate charter, bylaws, or other organizational documents to indemnify current and former officers, directors, members, managers, partners, agents or employees with respect to all present and future actions, suits and proceedings against the Debtor or such officers, directors, members, managers, partners, agents or employees, based upon any act or omission for or on behalf of the Debtor shall not be discharged or impaired by confirmation of the Plan provided that the Reorganized Debtor shall not indemnify directors of the Debtor for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act unless such director had no reasonable cause to believe its conduct was unlawful, or for any other acts or omissions that are excluded under the terms of the foregoing organizational documents.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtor under the Plan and shall continue as obligations of the Reorganized Debtor.  Any claim based on the Debtor's obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of Bankruptcy Code Section 502(e)(1)(B).  In addition, after the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce the coverage under any D&O Insurance Policies (including any "tail policy") in effect as of October 17, 2016, and all officers, directors, members and partners of the Debtor who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officer, directors, members or partners remain in such positions after the Effective Date.

(b)  Indemnification Obligations owed to any of the Debtor's Professionals pursuant to Bankruptcy Code Sections 327 or 328 and order of the Bankruptcy Court, whether such Indemnification Obligations relate to the period before or after the Petition Date, shall be deemed to be, and shall be treated as though they are, contracts that are assumed pursuant to Bankruptcy Code Section 365 under the Plan.

## ARTICLE VI

## SETTLEMENT, RELEASE, INJUCTION AND RELATED PROVISIONS

**6.1    Discharge of Claims**

On and after the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of its assets, property, or estate; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Bankruptcy Code Section 502(g); and (d) all entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, the Estate, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, provided, however, that the foregoing discharge shall not apply to the Unreleased Dynegy Claims.

**6.2    General Settlement of Claims and Interests**

Pursuant to Bankruptcy Code Section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  All distributions made to holders of Allowed Claims or Interests in any Class are intended to and shall be final.

**6.3    Release of Liens**

Except as otherwise provided in the Plan, the Genco Working Capital Facility Credit Agreement or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**6.4    Releases**

**(a)    Releases by the Debtor**

**On and after the Effective Date, for good and valuable consideration, each Released Party is and is deemed released and discharged by the Debtor, the Reorganized Debtor, its Estate, and any successor to any of the foregoing, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims that could be asserted on behalf of the Debtor that the Debtor, the Reorganized Debtor, or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership or operation thereof), the Debtor's restructuring efforts, intercompany transactions involving the Debtor or its subsidiaries, transactions involving the Debtor or its subsidiaries pursuant or related to the Shared Services Agreement, the Power Supply Agreement, or the Tax Sharing Agreement, the Genco Notes Indenture, any preference or avoidance claim relating to transfers made or obligations incurred by the Debtor or its subsidiaries pursuant to Bankruptcy Code Sections 544, 547, 548, and 549, the formulation, preparation, dissemination, or negotiation of the RSA or the Genco Working Capital Facility, or any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Exchange Offers, the Consent Solicitation, the Plan, the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of the New Securities pursuant to the Plan, or the distribution of property pursuant to the Plan or any other related agreement, or**

upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any Claim or Cause of Action the Debtor, the Reorganized Debtor, or the Estate has or may have against its subsidiaries, including, but not limited to, with respect to the EEI Promissory Note.

(b)     **Releases by Holders of Claims and Interests**

To the fullest extent permitted by applicable law, on and after the Effective Date, for good and valuable consideration, each holder of a Claim against or Interest in the Debtor (except for any holder of a Noteholder Claim in Class 5 that (i) (a) does not vote either to accept or to reject the Plan or (b) votes to reject the Plan and (ii) opts out of granting the releases set forth in this Section 6.4(b), pursuant to any Ballot cast on the Plan by such holder) is deemed to have released and discharged each of the Released Parties from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims that could be asserted on behalf of the Debtor, that the Debtor, the Reorganized Debtor, or its Estate would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership or operation thereof), the Debtor's restructuring efforts, intercompany transactions involving the Debtor or its subsidiaries, transactions involving the Debtor or its subsidiaries pursuant or related to the Shared Services Agreement, the Power Supply Agreement, or the Tax Sharing Agreement, the Genco Notes Indenture, any preference or avoidance claim relating to transfers made or obligations incurred by the Debtor or its subsidiaries pursuant to Bankruptcy Code Sections 544, 547, 548, and 549 or applicable state law, the formulation, preparation, dissemination, or negotiation of the RSA or the Genco Working Capital Facility, or any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Exchange Offers, the Consent Solicitation, the Plan, the Chapter 11 Case, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of New Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) any Claim or Cause of Action against a Released Party (other than the Debtor and its subsidiaries) based on or relating to, or in any manner arising from, securities existing on or before the Effective Date that were issued by a Released Party (other than the Debtor and its subsidiaries) or debt incurred by a Released Party (other than the Debtor and its subsidiaries); and (c) the Unreleased Dynegy Claims.

**6.5     Exculpation and Limitation of Liability**

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action or liability for any Claim in connection with or arising out of the formulation, preparation, dissemination, or negotiation of the RSA or the Genco Working Capital Facility, or any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Exchange Offers, the Consent Solicitation, the Plan, the Chapter 11 Case, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of New Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for willful misconduct or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities with respect to the foregoing; <u>provided</u>, <u>however</u>, that the foregoing exculpation shall not apply to the Unreleased Dynegy Claims. The Debtor, the Reorganized Debtor, Dynegy and the Consenting Noteholders (and each of their respective affiliates, agents, directors, officers, employees, advisors, and

attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the New Securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of any security thereunder.

**6.6     Injunction**

(a)     Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is Reinstated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or Reinstated Interests or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor or the Reorganized Debtor; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(b)     Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Article VI hereof are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or Reinstated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(c)     Without limiting the effect of the foregoing provisions of this Section 6.6 upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Allowed Interests receiving distributions or having been Reinstated pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 6.6.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

**7.1     Distributions on Account of Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtor or the Reorganized Debtor (as the case may be) and the holder of the applicable Allowed Claim, the Reorganized Debtor shall make initial distributions under the Plan on account of Allowed Claims on or as soon as reasonably practicable after the Effective Date, subject to the Debtor's and Reorganized Debtor's right to object to Claims; provided, however, that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case or assumed by the Debtor prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Section 2.1(b).  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtor or the Reorganized Debtor (as the case may be) and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

US-DOCS\71982692.16

**7.2**     **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. No reserve for Disputed Claims shall be required unless otherwise agreed by Dynegy or ordered by the Bankruptcy Court.

**7.3**     **Disbursing Agent**

On or before the Effective Date, the Debtor shall designate the Person(s) (whether the Reorganized Debtor or one or more independent third parties) to serve as the Disbursing Agent(s) under the Plan.  All Distributions under the Plan shall be made by the Disbursing Agent on or as soon as is practicable after the Effective Date.  The Debtor, the Reorganized Debtor, the Indenture Trustee and the Disbursing Agent, as applicable, shall not be required to give any bond or surety or other security for the performance of the duties of the Disbursing Agent unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtor.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

The Disbursing Agent(s) shall make distributions to the holders of the Allowed Claims in the same manner and to the same addresses as payments are made in the ordinary course of the Debtor's businesses; provided, however, that if a Proof of Claim references a different payment address, the address on the Proof of Claim shall be used. The Reorganized Debtor and the Disbursing Agent(s) shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtor's or Reorganized Debtor's books and records, and the Proofs of Claim filed against the Debtor (if any).  The Debtor and Reorganized Debtor shall use all commercially reasonable efforts to provide the Disbursing Agent(s) with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtor's or Reorganized Debtor's books and records. Notwithstanding anything to the contrary contained in this Plan, distributions on account of Noteholder Claims shall be made to the account of, or at the direction of, the Indenture Trustee and shall be subject to the Indenture Trustee's Charging Lien.

If any Disbursing Agent is an independent third party, such Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from the Reorganized Debtor.

**7.4**     **Distributions on Account of Noteholder Claims**

<div style="border:1px solid black; padding:8px; text-align:center;">

**THE DETAILED PROCEDURES WITH RESPECT TO PLAN DISTRIBUTIONS ON ACCOUNT OF THE GENCO NOTES WILL BE SET FORTH IN THE ELIGIBILITY LETTER, WHICH WILL BE SENT TO NOTEHOLDERS PROMPTLY AFTER THE PETITION DATE.**

**ANY HOLDER OF GENCO NOTES WHO FAILS TO FOLLOW THE INSTRUCTIONS IN THIS SECTION 7.4 AND THOSE SET FORTH IN THE ELIGIBILITY LETTER ON OR PRIOR TO ONE HUNDRED AND SIXTY-FIVE (165) DAYS AFTER THE EFFECTIVE DATE SHALL HAVE ITS NOTEHOLDER CLAIM AND ITS RIGHT TO ANY DISTRIBUTION IN RESPECT THEREOF PURSUANT TO THE PLAN OR OTHERWISE ON ACCOUNT OF SUCH NOTEHOLDER CLAIM DISCHARGED AND FORFEITED AND SHALL NOT PARTICIPATE IN ANY DISTRIBUTION UNDER THE PLAN IN RESPECT OF ITS NOTEHOLDER CLAIMS.**

**ANY PROPERTY IN RESPECT OF SUCH FORFEITED NOTEHOLDER CLAIM DISTRIBUTION SHALL REVERT TO DYNEGY OR THE REORGANIZED DEBTOR, AS APPLICABLE.**

</div>

US-DOCS\71982692.16

(a)    **Eligibility for Noteholders to Receive Distributions Under the Plan**

As a condition to participation under the Plan, each holder of a Noteholder Claim is required to review the Eligibility Letter (which will be distributed promptly after the Petition Date according to the terms hereof) and take the following actions, as applicable, to tender its Genco Notes.

(i)    Holders of Noteholder Claims that are Eligible Holders must:

A.    on or before the Distribution Certification Deadline, complete the Book-Entry Confirmation Procedure (which will be fully described in the Eligibility Letter) for Eligible Holders; or

B.    after the Distribution Certification Deadline, complete and return a duly completed Eligibility Letter to the Debtor or Reorganized Debtor, as applicable, together with any documents required in connection therewith.

(ii)    Holders of Noteholder Claims that are Non-Eligible Holders must:

A.    on or before the Distribution Certification Deadline, complete the Book-Entry Confirmation Procedure (which will be fully described in the Eligibility Letter) for Non-Eligible Holders; or

B.    after the Distribution Certification Deadline, complete and return a duly completed Eligibility Letter to the Debtor or Reorganized Debtor, as applicable, together with any documents required in connection therewith.

Detailed procedures and complete instructions for Noteholders with respect to distributions on account of the Genco Notes will be included in the Eligibility Letter (which will be sent after the Petition Date).

If any Genco Notes remain un-surrendered on the Effective Date, then on or promptly after the Effective Date, the Reorganized Debtor will request that DTC impose a "chill order" on any Genco Notes that have not been validly surrendered prior to the Distribution Certification Deadline.

(b)    **Initial Noteholder Claim Distributions**

(i)    <u>To Eligible Holders</u>: On the Effective Date, the Disbursing Agent will distribute to or at the direction of the Indenture Trustee for distribution to Eligible Holders the Eligible Holder Distribution corresponding to each Eligible Holder that has completed the procedures specified in Section 7.4(a)(i) above prior to the Distribution Certification Deadline.

(ii)    <u>To Non-Eligible Holders</u>: On the Effective Date, the Disbursing Agent will distribute to or at the direction of the Indenture Trustee for distribution to Non-Eligible Holders the Non-Eligible Holder Distribution corresponding to each Non-Eligible Holder that has completed the procedures specified in clause Section 7.4(a)(ii) above prior to the Distribution Certification Deadline.

(c)    **Interim Noteholder Claim Distributions**

On the date that is seventy-five (75) days following the Effective Date (the "**Interim Distribution Date**"), the Disbursing Agent will:

(i)    Deliver to each Eligible Holder that has completed the procedures specified in Section 7.4(a)(i) after the Distribution Certification Deadline but on or prior to the date that is sixty (60) days after the Effective Date, the Eligible Holder Distribution that such

Eligible Holder is entitled to receive under the Plan, which Eligible Holder Distribution will be delivered by crediting the DTC account specified by such Eligible Holder in their Eligibility Letter (via Deposit/Withdrawal at Custodian ("**DWAC**") procedures in cooperation with and at the direction of the indenture trustee for the New Dynegy Notes). Eligible Holders will be compensated for any interest payments, pre-payments, repayments, redemptions or other distributions made from the Effective Date through and including such Interim Distribution Date, as if such Eligible Holder had received its New Securities on the Effective Date; and

(ii)    Deliver to each Non-Eligible Holder that has completed the procedures specified in Section 7.4(a)(ii) after the Distribution Certification Deadline but on or prior to the date that is sixty (60) days after the Effective Date, the Non-Eligible Holder Distribution that such Non-Eligible Holder is entitled to receive under the Plan, which Non-Eligible Holder Distribution will be delivered by crediting the bank account specified by such Non-Eligible Holder in the Eligibility Letter.  Non-Eligible Holders receiving a Non-Eligible Holder Distribution on the Interim Distribution Date will not be entitled to interest on such Non-Eligible Holder Distribution with respect to the period after the Effective Date.

(d)    **Final Noteholder Claim Distributions**

On the date that is one hundred and eighty (180) days following the Effective Date (the "**Final Distribution Date**"), the Disbursing Agent will:

(i)    Deliver to each Eligible Holder that has completed the procedures specified in Section 7.4(a)(i) after the deadline with respect to the Interim Distribution Date but on or prior to the date that is 165 days after the Effective Date, the Eligible Holder Distribution that such Eligible Holder is entitled to receive under the Plan, which Eligible Holder Distribution will be delivered by crediting the DTC account specified by such Eligible Holder in their Eligibility Letter (via DWAC procedures in cooperation with and at the direction of the indenture trustee for the New Dynegy Notes).  Eligible Holders will be compensated for any interest payments, pre-payments, repayments, redemptions or other distributions made from the Effective Date through and including such Final Distribution Date, as if such Eligible Holder had received its New Securities on the Effective Date; and

(ii)    Deliver to each Non-Eligible Holder that has completed the procedures specified in Section 7.4(a)(ii) after the deadline with respect to the Interim Distribution Date but on or prior to the date that is 165 days after the Effective Date, the Non-Eligible Holder Distribution that such Non-Eligible Holder is entitled to receive under the Plan, which Non-Eligible Holder Distribution will be delivered by crediting the bank account specified by such Non-Eligible Holder in the Eligibility Letter.  Non-Eligible Holders receiving a Non-Eligible Holder Distribution on the Final Distribution Date will not be entitled to interest on such Non-Eligible Holder Distribution with respect to the period after the Effective Date.

(e)    **Forfeiture of Noteholder Claims Distribution**

The Disbursing Agent shall use reasonable best efforts to effect distributions to all holders of certificates or instruments relating to the Genco Notes and shall execute such other documents as might be necessary to effectuate the Plan.  Detailed procedures with respect to distributions on account of the Genco Notes will be set forth in the Eligibility Letter.

**Any holder of Genco Notes who fails to follow the instructions set forth in this Section 7.4 and the Eligibility Letter on or prior to one hundred and sixty five (165) days after the Effective Date shall have its Claim and its distribution pursuant to the Plan on account of such Noteholder Claim discharged and forfeited**

**and shall not participate in any distribution under the Plan. Any property in respect of such forfeited Noteholder Claims will revert to Dynegy or the Reorganized Debtor, as applicable**.

**7.5    Delivery of Distributions**

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims, other than Noteholder Claims, shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtor or the Disbursing Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor has not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (c) on any counsel that has appeared in the Chapter 11 Case on the holder's behalf. The Debtor shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date; provided, however, that distributions on account of the Noteholder Claims shall be made in accordance with Section 7.4 above.  Subject to this Article VII, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtor, the Reorganized Debtor, the Indenture Trustee and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

**7.6    Calculation of Distribution Amounts of New Securities**

No fractional shares of New Securities shall be issued or distributed under the Plan.  Each Person entitled to receive New Securities shall receive the total number of whole New Dynegy Warrants, and the principal amount of New Dynegy Notes to which such Person is entitled.  Dynegy will issue the New Dynegy Notes in a minimum denomination of $1.00 and in integral multiples of $1.00 in excess thereof. The principal amount of New Dynegy Notes to be issued to any Eligible Holder will be rounded down to the nearest $1.00.  The amount of New Dynegy Warrants will be rounded down to the nearest whole number. No payment or distribution will be made with respect to any fractional portion of New Dynegy Notes or New Dynegy Warrants not received as a result of such rounding. Upon the allocation of all of the whole New Securities authorized under the Plan, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.  The Disbursing Agent shall have the right to carry forward to subsequent distributions any applicable credits or debits arising from the rounding described in this paragraph.

**7.7    Minimum; *De Minimis* Distributions**

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the holder of any Allowed Claim or Allowed Interest if the amount of Cash or other property to be distributed on account of such Allowed Claim or Allowed Interest is less than $50. Any holder of an Allowed Claim or Allowed Interest on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim or Interest, as applicable, discharged and shall be forever barred from asserting such Claim or Interest against the Debtor, the Reorganized Debtor, or their respective property.  Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtor.

**7.8    Section 4(a)(2) and Regulation S Exemptions**

Section 4(a)(2) of the Securities Act provides that the registration requirements of the Securities Act will not apply to "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). In addition, 17 CFR 230.901 provides that for the purposes of the registration requirements of the Securities Act (15 U.S.C. § 77(e)), "the terms *offer*, *offer to sell*, *sell*, *sale*, and *offer to buy* shall be deemed to include offers and sales that occur within the United States and shall be deemed not to include offers and sales that occur outside the United States."

The New Securities are being issued only to Eligible Holders.  Consequently, the Debtor believes that the solicitation of votes from Eligible Holders to accept or reject the Plan is not a public offering (and is therefore exempt from the registration requirements of Section 5 of the Securities Act pursuant to Section 4(a)(2) of the

Securities Act) or is an offering of securities outside the United States (and therefore is not subject to the registration requirements of Section 5 as set forth in Regulation S, 17 CFR 230.900 et seq).

The Debtor believes that the solicitation of votes from Non-Eligible Holders constitutes a cash tender offer for the Genco Notes that complies with Regulation 14E under the Securities Exchange Act of 1934, 240 CFR 14e-1 et seq.

**7.9    Undeliverable and Unclaimed Distributions**

    **(a)    Distributions Returned as Undeliverable**

If any distribution to a holder of an Allowed Claim is returned to the Reorganized Debtor or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such holder unless and until the Reorganized Debtor or the Disbursing Agent are notified in writing of such holder's then-current address or other necessary information for delivery.   Subject to the succeeding sentence, the Reorganized Debtor or the Disbursing Agent shall retain undeliverable distributions until such time as a distribution becomes deliverable. Subject to Section 7.4 hereof, each holder of an Allowed Claim whose distribution remains (i) undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (ii) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan. Nothing contained in this Plan shall require the Debtor, the Reorganized Debtor, the Indenture Trustee or the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

    **(b)    Reversion**

Subject to Section 7.4, any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution shall be deemed unclaimed property under Bankruptcy Code Section 347(b) and such Unclaimed Distribution shall revest in the Reorganized Debtor.  Upon such revesting, the Claim or Interest of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

**7.10    Determination of Allowability of Claims and Interests and Rights to Distributions**

    **(a)**    Only holders of Allowed Claims and Allowed Interests shall be entitled to receive distributions under the Plan.

    **(b)**    Unless otherwise provided in the Plan, the Disclosure Statement or an order of the Bankruptcy Court (including, *inter alia*, with respect to Claims subject to Bankruptcy Code Section 510(b)), there shall be no requirement for holders of Claims to file Proofs of Claim, or for holders of Interests to file any proofs of Interest; provided that the Reorganized Debtor reserves the right to establish a Bar Date for parties to file Proofs of Claim, which Bar Date will be approved by an order of the Bankruptcy Court; provided, further, that requests for payment of Administrative Claims must be filed by the Administrative Claims Bar Date pursuant to Section 2.1(a) hereof. With respect to Proofs of Claim and proofs of Interest that are filed with the Bankruptcy Court or Claims Agent, the Debtor or the Reorganized Debtor shall have the right to object to the Proofs of Claim or proofs of Interest in the Bankruptcy Court by the Claims Objection Deadline.  The Debtor or the Reorganized Debtor shall have the right to dispute all Claims and Interests and alleged Claims and alleged Interests in any manner that would have been available to it had the Chapter 11 Case not been filed (including, without limitation, by declining to pay any alleged Claim or to recognize any alleged Interest), or may elect in its discretion to have any alleged Claim or Interest adjudicated by the Bankruptcy Court; provided, however, that notwithstanding anything to the contrary in this Plan, neither the Debtor nor the Reorganized Debtor shall dispute the Noteholder Claims Allowed pursuant to the Plan or the RSA Fee.

    **(c)**    No distributions shall be made on Disputed Claims until and unless such Disputed Claims become Allowed Claims.

US-DOCS\71982692.16

**7.11    Timing of Distributions to Holders of Allowed Claims**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims shall be made on or as soon as reasonably practicable after the Effective Date or the date on which such Claim becomes Allowed; provided, however, for the avoidance of doubt, that distributions on account of Noteholder Claims hereunder shall be made on the terms described in Section 7.4 hereof.  The Reorganized Debtor or the Disbursing Agent shall have the right, in its discretion, to accelerate any distribution occurring after the Effective Date if the facts and circumstances so warrant.

**7.12    Application of Distribution Record Date**

On the applicable Distribution Record Date, for all Claims other than Noteholder Claims, the records of the Debtor shall be closed for purposes of determining the record holders of Claims or Interests, and there shall be no further changes in the record holders of any Claims or Interests.  Except as provided herein, the Reorganized Debtor, the Disbursing Agent(s), and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims or Interests occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the applicable books and records, claims registers or transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

**7.13    Withholding and Reporting Requirements**

In connection with the Plan and all distributions hereunder, the applicable Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent(s) shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a distribution, the holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder.  Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the applicable Disbursing Agent to allow it to comply with its tax withholding and reporting requirements.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Indenture Trustee or the Disbursing Agent, as the case may be, until such time as the Disbursing Agent is satisfied with the holder's arrangements for any withholding tax obligations.

**7.14    Setoffs**

Except as otherwise provided in the Plan, the Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such holder.

**7.15    Prepayment**

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Reorganized Debtor shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; provided, however, that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

**7.16**     **Allocation of Distributions**

All distributions received under the Plan by holders of applicable Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

**7.17**     **Estimation of Claims**

The Debtor or the Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to Bankruptcy Code Section 502(c) regardless of whether the Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

<div align="center">

**ARTICLE VIII**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

</div>

**8.1**     **Conditions to Confirmation**

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Section 8.3 hereof:

**(a)**     the Bankruptcy Court shall have entered an order, pursuant to Bankruptcy Code Sections 1125 and 1126, approving the Disclosure Statement and the solicitation and tabulation of votes with respect to the Plan, which order shall be in form and substance reasonably acceptable to the Debtor, Dynegy and the Majority Consenting Noteholders;

**(b)**     the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtor, Dynegy and the Majority Consenting Noteholders, which Confirmation Order shall, among other things:

> **(i)**     authorize the Debtor and the Reorganized Debtor to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan;

> **(ii)**     decree that the provisions of the Confirmation Order and the Plan are non-severable and mutually dependent; and

> **(iii)**     authorize the implementation of the Plan in accordance with its terms, including authorizing the issuance of all consideration to be issued under the Plan, including the New Securities, and authorizing entry into all agreements necessary to effectuate the Plan, including the Genco Working Capital Facility, the New Genco Governing Documents, the New Indenture and the New Warrant Agreement.

<div align="center">33</div>

**8.2**      **Conditions to Effective Date**

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 8.3 hereof:

    **(i)**      The Confirmation Order shall (a) have been entered in a form and substance reasonably satisfactory to the Debtor, Dynegy and the Majority Consenting Noteholders and (b) have become a Final Order;

    **(ii)**      The final version of the Plan Supplement and all of the schedules, documents and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Debtor, Dynegy and the Consenting Noteholders in accordance with the RSA;

    **(iii)**      All actions, documents, certificates and agreements necessary to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required; provided, however, that each document, instrument and agreement must be reasonably acceptable to the Debtor, Dynegy and the Consenting Noteholders in accordance with the RSA;

    **(iv)**      The Bankruptcy Court shall not have required the establishment of a Disputed Claims reserve in an amount greater than $10 million;

    **(v)**      All authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan shall have been received, waived or otherwise resolved; and

    **(vi)**      The Reorganized Debtor shall have entered into the Genco Working Capital Facility Credit Agreement, and all conditions precedent to the consummation or effectiveness of the entry in to the Genco Working Capital Facility shall have been waived or satisfied in accordance with the terms thereof, and any funding contemplated to be made on the Effective Date shall have been made in accordance with the applicable financing documents.

**8.3**      **Waiver of Conditions**

Each of the conditions set forth in Sections 8.1 and 8.2, may be waived in whole or in part by the Debtor, without any notice to parties in interest or the Bankruptcy Court and without a hearing, provided, however, that such waiver shall not be effective without the consent of Dynegy and the Majority Consenting Noteholders in accordance with the RSA. Notwithstanding the foregoing, only Dynegy may waive, in its sole discretion, the condition to the Effective Date set forth in Section 8.2(iv).

**8.4**      **Effect of Failure of Conditions**

If the Consummation of the Plan does not occur prior to termination of the RSA in accordance with its terms, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by Dynegy or the holders of any Claims or Interests; (2) prejudice in any manner the rights of the Debtor, any holders of any Claims or Interests or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any holders  of any Claims or Interests or any other Entity in any respect.

US-DOCS\71982692.16

# ARTICLE IX

# RETENTION OF JURISDICTION

**9.1     Scope of Retention of Jurisdiction**

Under Bankruptcy Code Sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

**(a)** allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims or Interests;

**(b)** hear and determine all applications for Professional Fees; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

**(c)** hear and determine all matters with respect to contracts or leases or the assumption or rejection of any contracts or leases to which a Debtor is a party or with respect to which the Debtor may be liable, including, if necessary and without limitation, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

**(d)** effectuate performance of and payments under the provisions of the Plan;

**(e)** hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;

**(f)** adjudicate, decide or resolve any and all matters related to Bankruptcy Code Section 1141;

**(g)** enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

**(h)** hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with the Plan, provided, however, that any dispute arising under or in connection with the New Securities, the Genco Working Capital Facility, the New Genco Governing Documents, the New Warrant Agreement or the New Indenture shall be dealt with in accordance with the provisions of the applicable document;

**(i)** consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

**(j)** issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

**(k)** enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

**(l)** hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

**(m)**      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case or provided for under the Plan;

**(n)**      except as otherwise limited herein, recover all assets of the Debtor and property of the Estate, wherever located;

**(o)**      hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code Sections 346, 505, and 1146;

**(p)**      hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

**(q)**      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

**(r)**      enter a final decree closing the Chapter 11 Case.

**9.2      Failure of the Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 9.1 above, the provisions of this Article IX shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

**10.1      Binding Effect and Successors and Assigns**

Subject to Article VI hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 7062 or otherwise, upon the occurrence of the Effective Date, the rights, benefits, and obligations of any Person named or referred to in the Plan shall be immediately binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person, including, but not limited to, the Reorganized Debtor and all other parties in interest in the Chapter 11 Case, including any and all holders of Claims or Interests (irrespective of whether holders of such Claims or Interests are deemed to have accepted the Plan).

**10.2      Additional Documents**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or Reorganized Debtor, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**10.3      Professional Fee Claims**

On the later of (i) the Effective Date and (ii) the date the Bankruptcy Court enters an order approving the fee applications of the applicable Professional, the Debtor shall pay all amounts owing to the Professionals for all unpaid Professional Fee Claims relating to prior periods and for the period ending on the Effective Date, subject to the applicable Holdback Amount.  Each Professional shall estimate its Professional Fee Claims due for periods that have not been billed as of the Effective Date.  On or prior to forty-five (45) days after the Effective Date, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date; provided that the Reorganized Debtor may pay retained Professionals or other Entities in the ordinary course of business after the Effective Date, without further Bankruptcy Court order.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtor and the requesting party no later than twenty (20) days after such Professional Fee Claim is Filed with the Bankruptcy Court.  To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously

entered order regarding the payment of Professional Fee Claims. Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment to the Reorganized Debtor, and the Reorganized Debtor shall pay any unpaid amounts to each Professional.

**10.4    Fees and Expenses of Ad Hoc Group**

On the Effective Date, the Reorganized Debtor shall reimburse, in accordance with the terms of the respective engagement letters of the Ad Hoc Group Advisors, the then-outstanding (i) reasonable documented out-of-pocket expenses of the members of the Ad Hoc Group and (ii) fees and expenses of each of the Ad Hoc Group Advisors; without the need for any of the members of the Ad Hoc Group or either of the Ad Hoc Group Advisors to file an application or otherwise seek Bankruptcy Court approval for such payment.

**10.5    Releases and Satisfaction of Subordination Rights**

All Claims against the Debtor and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any claimed subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, or implemented in Article III hereof. Distributions under, described in, contemplated by, or implemented by the Plan to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any claimed subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**10.6    Special Provision Regarding Defined Benefit Pension Plans**

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including Section 1141 thereof) to the contrary, including but not limited to Article VI hereof, neither the Plan, the Confirmation Order, nor the Bankruptcy Code shall release, discharge or exculpate the Debtor, the Reorganized Debtor, or any Person, in any capacity, from any liability or responsibility with respect to any defined benefit pension plan under any law, governmental policy, or regulatory provision. The Pension Benefit Guaranty Corporation and any defined benefit pension plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, the Confirmation Order or the Bankruptcy Code.

**10.7    No Impairment of Rights of Insurers and Sureties**

Nothing in the Plan or the Confirmation Order (including, without limitation, any provision that purports to be preemptory or supervening or grants an injunction or release) alters the rights and obligations of the Debtor and the Debtor's insurers and sureties (or any of their affiliates) under any insurance policies and bonds (and any agreements related thereto) or modifies the coverage provided thereunder or the terms and conditions thereof except that on and after the Effective Date, the Reorganized Debtor shall become and remain liable for all of the Debtor's obligations under the insurance policies, bonds and agreements regardless of whether such obligations arise before or after the Effective Date. Any such rights and obligations shall be determined under the applicable insurance policies, bonds and agreements and applicable non-bankruptcy law.

**10.8    Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code Sections 105 or 362 or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

**10.9    Entire Agreement**

Except as otherwise indicated, the Plan, the Plan Supplement and all exhibits thereto supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan and the Plan Supplement.

**10.10    Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the website of the Debtor's notice and claims agent at http://dm.epiq11.com/IPG or the Bankruptcy Court's website at http://ecf.txsb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**10.11    Modifications and Amendments**

The Debtor, subject to the consent of Dynegy and the Consenting Noteholders in accordance with the RSA, may alter, amend, or modify the Plan under Bankruptcy Code Section 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Bankruptcy Code Section 1101(2), the Debtor may, subject to the consent of Dynegy and the Consenting Noteholders in accordance with the RSA, under Bankruptcy Code Section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

**10.12    Severability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of Dynegy, the Debtor and the Consenting Noteholders in accordance with the RSA, and (iii) nonseverable and mutually dependent. Unless the Bankruptcy Court orders otherwise, any ambiguities or uncertainties with respect to interpretation of the Plan, the Plan Supplement, the Disclosure Statement or any other document related thereto shall be interpreted based on the Debtor's or the Reorganized Debtor's interpretation thereof.

**10.13    Revocation, Withdrawal, or Non-Consummation**

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan in accordance with this Section 10.13, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any Person, including any of Dynegy or the Consenting Noteholders, in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person, including any of Dynegy or the Consenting Noteholders.

**10.14    Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the filing of the Plan, any statement or provision contained in the Plan or the taking of any

action by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims or Equity prior to the Effective Date.

**10.15    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code Section 1125(e), the Debtor and each of its Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer and issuance of the New Securities distributed under the Plan, and, therefore, such parties, individuals and the Debtor will not have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer and issuance of the securities offered and distributed under the Plan.

**10.16    Waiver or Estoppel**

**The Plan provides that each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor, its counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or documents filed with the Bankruptcy Court prior to the Confirmation Date.  For the avoidance of doubt, this provision in the Plan is not intended to limit a creditor's ability to enter into a consensual post-confirmation resolution of its Claim.**

**10.17    Notices**

Any notice, request, or demand required or permitted to be made or provided to or upon the Debtor or the Reorganized Debtor under the Plan, the Consenting Noteholders or Dynegy, shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, and (d) addressed as follows:

**For the Debtor:**

Illinois Power Generating Company
601 Travis, Suite 1400
Houston, Texas 77002
Attn:  David F. Sladic
Facsimile: 713-356-2041

with copies to:

LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Attn:  D. J. Baker, Esq. and Caroline A. Reckler, Esq.
Facsimile:  212-751-4864

-and-

ANDREWS KURTH KENYON LLP
600 Travis, Suite 4200
Houston, TX 77002
Attn:  Timothy A. Davidson II, Esq. and Joseph W. Buoni, Esq.
Facsimile:  713-220-4285

**For Dynegy:**

Dynegy Inc.
601 Travis, Suite 1400
Houston, TX  77002
Attn:  Catherine James, Executive Vice President, General Counsel and Chief
Compliance Officer
Facsimile:  713-507-6588

with copies to:

WHITE & CASE LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL  33131
Attn: Thomas E. Lauria, Esq. and Matthew Brown, Esq.
Facsimile:  305-358-5744


**For the Consenting Noteholders:**

WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, NY  10019
Attn:  Joseph G. Minias, Esq. and Weston T. Eguchi, Esq.
Facsimile: 212-728-8111

**[SIGNATURE PAGE FOLLOWS]**

**Exhibit A**

**Term Sheet**[1]

**New Dynegy Notes**

The New Dynegy Notes will be issued under the New Indenture, which will contain terms and conditions substantially in accordance with the terms and conditions as set forth in this <u>Exhibit A</u> and the "Description of the Dynegy Notes" in the Disclosure Statement.

**Issuer**................................................... Dynegy Inc.

**New Dynegy Notes** ............................ Up to $210 million aggregate principal amount of 7-Year Senior Notes.

**Maturity Date**..................................... Seven years from the Effective Date.

**Interest Payment Dates** .................... The interest payment dates for each year will be (1) the first 1st or 15th of a month that occurs after the Issue Date and (2) the date that is six months after such date (for example, if the Issue Date is December 5, the interest payment dates will be December 15 and May 15 of each year); *provided* that no interest payment shall be made on the first 1st or 15th of a month that occurs after the Issue Date.

**Interest**................................................ Interest on the New Dynegy Notes will accrue at a rate per annum equal to the lesser of (1) the average of (a) the 2023 VWAY  and (b) the 2024 VWAY or (2) the 2024 VWAY, which shall be calculated on the Effective Date.

**Guarantees** ......................................... The New Dynegy Notes will be jointly and severally guaranteed by each of Dynegy's current and future wholly-owned domestic subsidiaries that from time to time is a borrower or guarantor under the Credit Agreement dated April 23, 2013 among Dynegy, various lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time (the "<u>Credit Agreement</u>").

**Ranking** ............................................. The New Dynegy Notes and the related guarantees will be:

(i)     general unsecured senior obligations of Dynegy and the guarantors;

(ii)    *pari passu* in right of payment with all of Dynegy's and the guarantors' existing and future senior indebtedness;

(iii)   senior in right of payment to any of Dynegy's and the guarantors' subordinated indebtedness;

(iv)    effectively subordinated to Dynegy's and the guarantors' secured indebtedness (including indebtedness under the Credit Agreement), in each case to the extent of the value of the collateral securing such indebtedness; and

(v)     structurally subordinated to all indebtedness of Dynegy's non-guarantor

---

[1]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan, or the Disclosure Statement, as applicable.

subsidiaries to third parties.

**Optional Redemption** ........................ Dynegy may redeem any of the New Dynegy Notes beginning on the second anniversary of the date of issuance at the redemption prices set forth in the Disclosure Statement. Dynegy may also redeem any of the New Dynegy Notes at any time prior to the second anniversary of the issuance of the New Dynegy Notes at a price equal to 100% of the aggregate principal amount thereof plus the Applicable Premium and accrued and unpaid interest, if any, to but excluding the redemption date.

**Change of Control** ............................ Upon the occurrence of a Change of Control, Dynegy will be required to offer to purchase each holder's New Dynegy Notes at a price equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to but excluding the date of purchase.

**Certain Covenants** ............................ The New Indenture will, among other things, limit Dynegy's ability and the ability of the guarantors to, subject to a number of important qualifications and exceptions:

- create liens upon any principal property to secure debt for borrowed money; and

- consolidate, merge or sell all or substantially all of Dynegy's assets.

**Transfer Restrictions** ........................ The New Dynegy Notes will be issued to Eligible Holders in reliance upon an exemption from registration under Bankruptcy Code Section 1145. As a result, Eligible Holders may offer or resell New Dynegy Notes issued pursuant to the Plan without registration, unless such Eligible Holder is an "underwriter" (as defined in Bankruptcy Code Section 1145(b)(1)) with respect to such securities.

**No Public Trading Market** ................ The New Dynegy Notes are a new issue of securities with no established trading market. Dynegy does not intend to list the New Dynegy Notes on any national securities exchange or to arrange for quotation on any automated dealer quotation systems. Dynegy cannot assure investors that an active trading market for the New Dynegy Notes will develop.

**Form and Denominations** ................. The New Dynegy Notes will be represented by one or more global notes deposited with the trustee as custodian for DTC. Beneficial interests in the global notes will be shown on, and any transfers will be effective only through, records maintained by DTC and its participants, including Euroclear and Clearstream.

Interests in the global notes will be issued in minimum denominations of $1.00 and in integral multiples of $1.00 in excess thereof. The principal amount of New Dynegy Notes to be issued to any Eligible Holder will be rounded down to the nearest $1.00. No payment or distribution will be made with respect to any fractional portion of New Dynegy Notes not received as a result of such rounding.

**Trustee** ................................................ Wilmington Trust, National Association

2

**Exhibit B**

---

**Term Sheet**[1]

**New Dynegy Warrants**

The New Dynegy Warrants will be issued under the New Warrant Agreement, which will contain terms and conditions substantially in accordance with the terms and conditions as set forth in this <u>Exhibit B</u> and the "Description of the Dynegy Warrants" in the Disclosure Statement.

**Issuer**..................................................  Dynegy Inc.

**Warrants Offered** .............................  Up to 10 million New Dynegy Warrants, each of which will be exercisable for one share of Dynegy Common Stock.

**Exercise**...............................................  The New Dynegy Warrants will be exercisable in a cashless exercise in exchange for Dynegy Common Stock (the "<u>Warrant Shares</u>"). The number of Warrant Shares issuable upon cashless exercise of the New Dynegy Warrants is subject to adjustment based upon the market price of Dynegy Common Stock.

**Exercise Price**....................................  $35.00.

**Adjustments to Prevent Dilution** ......  The Exercise Price, the number of Warrant Shares issuable upon the exercise of each New Dynegy Warrant and the number of New Dynegy Warrants outstanding are subject to adjustment from time to time upon the occurrence of the following with respect to Dynegy:

- stock splits, combinations, etc.;

- issuance or expiration of options, warrants or convertible securities;

- dividends or distributions;

- certain issuances of common stock;

- other actions affecting common stock equivalents; and

- the consolidation, merger or sale of assets.

**Expiration**...........................................  The New Dynegy Warrants are exercisable until 5:00 p.m. New York City time, on the date that is seven years from Effective Date, or, if such date is not a Business Day, the next subsequent Business Day.

**Transfer Restrictions**........................  The New Dynegy Warrants and Warrant Shares will be issued to Eligible Holders in reliance upon an exemption from registration under Bankruptcy Code Section 1145.  As a result, Eligible Holders may offer or resell New Dynegy Warrants issued pursuant to the Plan without registration, unless such Eligible Holder is an "underwriter" (as defined in Bankruptcy Code Section 1145(b)(1)) with respect to such securities.

**Listing on NYSE** ...............................  Dynegy will use commercially reasonable efforts to list, and maintain the

---

[1]  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan, or the Disclosure Statement, as applicable.

listing of, the New Dynegy Warrants on The New York Stock Exchange (the "NYSE") (to the extent the requirement for listing on NYSE are satisfied and the NYSE will accept the listing) as soon as practicable after the Effective Date; provided, that to the extent the New Dynegy Warrants are not listed after the Effective Date, Dynegy will use commercially reasonable efforts to list, or re-list, the New Dynegy Warrants upon request of holders of Registrable Securities constituting more than 10% of all Warrant Shares originally issuable upon exercise of all New Dynegy Warrants (in each case as adjusted by the anti-dilution provisions) (not more frequently than twice per fiscal year). The listing of the New Dynegy Warrants shall continue until the number of remaining Registrable Securities constitutes less than 10% of the Warrant Shares originally issuable upon exercise of all New Dynegy Warrants (in each case as adjusted by the anti-dilution provisions). Dynegy cannot assure investors that an active trading market for the New Dynegy Warrants will develop.

**Warrant Agent**.................................. Computershare Inc. and Computershare Trust Company, N.A.

2

**Exhibit C**

---

**Term Sheet[1]**

**Genco Working Capital Facility**

<u>PARTIES</u>

| | |
|---|---|
| Borrower: | Illinois Power Generating Company (the "<u>Borrower</u>"). |
| Guarantors: | None. |
| Lender: | Dynegy Inc. ("<u>Dynegy</u>" or the "<u>Lender</u>"). |

<u>TYPES AND AMOUNTS OF FIRST LIEN REVOLVING CREDIT FACILITIES</u>

<u>Tranche A Revolving Credit Facility:</u>

Type and Amount:

A 5-year tranche A revolving loan facility (the "<u>Tranche A Revolving Credit Facility</u>"; and the commitments thereunder, the "<u>Tranche A Revolving Commitments</u>") in an aggregate principal amount of $25 million[2] (the loans thereunder, the "<u>Tranche A Loans</u>").

Availability:

The Tranche A Revolving Credit Facility shall be available on a revolving basis during the period commencing on the date of the effectiveness of the First Lien Revolving Credit Facilities in accordance with the terms of the Credit Documentation (as defined below) and the satisfaction or waiver of the conditions precedent thereto (the "<u>Closing Date</u>") and ending on the date that is 5 years after the Closing Date (the "<u>Tranche A Revolving Termination Date</u>").

Amounts available under the Tranche A Revolving Credit Facility may be borrowed, repaid and reborrowed on and after the Closing Date until the Tranche A Revolving Termination Date.

Maturity:

The Tranche A Revolving Commitments shall terminate and the Tranche A Loans will mature on the Tranche A Revolving Termination Date.

Use of Proceeds:

Proceeds of the Tranche A Revolving Credit Facility may be used to satisfy the Borrower's ordinary course working capital needs and other general corporate purposes of the Borrower and its subsidiaries;

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan, or the Disclosure Statement, as applicable.

[2] The amount of the Tranche A Revolving Credit Facility may be adjusted based on adjustments, as of the Effective Date, to a number of assumptions underlying the contemplated amount of $25 million, including Genco's actual cash balance immediately prior to the Effective Date, actual and projected remaining transaction costs, and other items, in the reasonable determination of Dynegy, Genco and the Consenting Noteholders in accordance with the RSA.

Americas 92118342
US-DOCS\71982692.16

*provided* that (x) the proceeds of the Tranche A Revolving Credit Facility may not be used to satisfy any judgment or order or binding arbitration award (or multiple related judgments, orders or awards) against the Borrower or any of its subsidiaries in an aggregate amount exceeding $10 million and (y) if the Bankruptcy Court requires the Borrower to establish a reserve or reserves with respect to disputed claims, proceeds of the Tranche A Revolving Credit Facility may not be used to fund such a reserve or reserves in an aggregate amount in excess of $10 million.

**Tranche B Revolving Credit Facility:**

| | |
|---|---|
| Type and Amount: | A 5-year tranche B revolving loan facility (the "Tranche B Revolving Credit Facility" and, together with the Tranche A Revolving Credit Facility, the "First Lien Revolving Credit Facilities"); and the commitments thereunder, the "Tranche B Revolving Commitments" and, together with the Tranche A Revolving Commitments, the "Revolving Commitments") in an aggregate principal amount of up to $100 million [3] (the loans thereunder, the "Tranche B Loans" and, together with the Tranche A Revolving Credit Facility, the "First Lien Revolving Credit Facilities"). |
| Availability: | The Tranche B Revolving Credit Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the date that is 5 years after the Closing Date (the "Tranche B Revolving Termination Date" and, together with the Tranche A Termination Date, each a "Revolving Termination Date"). Amounts available under the Tranche B Revolving Credit Facility may be borrowed and on and after the Closing Date until the Tranche B Revolving Termination Date; provided that mandatory prepayments (and, at the option of the Lender (to be determined prior to the Closing Date) optional prepayments) of the Tranche B Term Loans shall reduce the Tranche B Revolving Commitments on a dollar-for dollar basis. |
| Maturity: | The Tranche B Revolving Commitments shall terminate and the Tranche B Loans will mature on the Tranche B Revolving Termination Date. |
| Use of Proceeds: | Proceeds of the Tranche B Revolving Credit Facility may be used to satisfy the Borrower's obligations to pay all or a portion of the Cash Consideration, Non-Eligible Holder Distributions and RSA Fee. |

**Certain Payment Provisions**

| | |
|---|---|
| Interest Rates with respect to all Loans: | 7.00% per annum, payable quarterly in arrears. |

---

[3] The amount of the Tranche B Revolving Credit Facility may be adjusted based on adjustments, as of the Effective Date, to a number of assumptions underlying the contemplated amount of $100 million, including Genco's actual cash balance immediately prior to the Effective Date, actual and projected remaining transaction costs, and other items, in the reasonable determination of Dynegy, Genco and the Consenting Noteholders in accordance with the RSA.

| | |
|---|---|
| Default Rate: | At any time when a payment event of default (with respect to any principal, interest, premiums or fees) or bankruptcy event of default with respect to the Borrower under the First Lien Revolving Credit Facilities exists, overdue amounts shall bear interest, to the fullest extent permitted by law, at (i) in the case of principal or interest, 2.00% per annum above the interest rate then borne by (in the case of such principal) such borrowings or (in the case of interest) the borrowings to which such overdue amount relates or (ii) in the case of fees and other amounts, 2.00% per annum in excess of the interest rate then applicable to the Loans. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed. |
| Optional Prepayments and Commitment Reductions: | Loans may be prepaid and commitments may be reduced, in whole or in part, without premium or penalty, in minimum amounts to be agreed, at the option of the Borrower at any time upon prior notice provided on the same business day.    Optional prepayments or commitment reductions shall be applied first to the Tranche B Loans or Tranche B Revolving Commitments and thereafter to the Tranche A Loans or Tranche A Revolving Commitments, as applicable. |
| Mandatory Prepayments and Commitment Reductions: | The following amounts shall be applied to prepay the Loans, in each case with customary carveouts and exceptions to be mutually agreed:

(a)  100% of the net cash proceeds of any incurrence of debt by the Borrower and its subsidiaries (with appropriate exceptions for all debt permitted under the Credit Documentation (as defined below) which shall include, in any event, guarantees of Dynegy Priority Debt (as defined below) and other indebtedness of Dynegy that is *pari passu* in right of payment with the obligations under the Dynegy Credit Agreement); and

(b)  100% of the net cash proceeds (above a threshold to be agreed per transaction (or series of related transactions) and per fiscal year) of any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Borrower or its subsidiaries, to the extent such sale or disposition is made to a person that is not the Borrower or a subsidiary of the Borrower, except for customary exceptions to be agreed upon (subject to customary reinvestment rights).

All mandatory prepayments of the Loans made pursuant to clauses (a) or (b) above shall be applied first to the Tranche B Loans until such Tranche B Loans are paid in full and thereafter to the Tranche A Loans.

In addition, the Lender's commitments to fund Loans under the Tranche A Revolving Credit Facility shall automatically terminate if a final judgment or order or binding arbitration award (or multiple related judgments, orders or awards) in an aggregate amount exceeding $10 million is entered against the Borrower or any of its subsidiaries.

The Tranche A Loans shall be prepaid to the extent all such extensions of credit under the Tranche A Revolving Credit Facility exceed the Tranche A Revolving Commitments and the Tranche B Loans shall be |

prepaid to the extent all such extensions of credit under the Tranche B Revolving Credit Facility exceed the Tranche B Revolving Commitments.

Collateral:

The obligations of the Borrower under the First Lien Revolving Credit Facilities shall be secured by a perfected first-priority security interest (subject to liens and other exceptions to be set forth in the Credit Documentation (including, without limitation, to the extent the Borrower constitutes a Guarantor under and as defined therein, the prior liens of the Collateral Trustee (as defined in that certain Credit Agreement, dated as of April 23, 2013, among Dynegy, Credit Suisse AG, Cayman Islands Branch and the other parties thereto (as may be amended, restated, supplemented, modified, refinanced or replaced from time to time, the "Dynegy Credit Agreement"), the "Collateral Trustee") created pursuant to the Security Documents (as defined in the Dynegy Credit Agreement) to secure the obligations under the Dynegy Credit Agreement and the other Credit Documents as defined therein (the "Dynegy Credit Documents") and any indebtedness of the Dynegy or any of its subsidiaries permitted pursuant to the terms of the Dynegy Credit Agreement that is pari passu in right of payment and security with the obligations under the Dynegy Credit Agreement (and the other Dynegy Credit Documents) (collectively, "Dynegy Priority Debt")) in substantially all of the Borrower's tangible and intangible assets (including, without limitation, a pledge of 100% of the capital stock of each direct or indirect domestic subsidiary of the Borrower, 65% of the voting capital stock (and 100% of the non-voting capital stock) of each first-tier foreign subsidiary of the Borrower (the "Collateral"), subject to usual and customary exceptions to be mutually agreed upon.  Notwithstanding the foregoing, (x) the Collateral will exclude all Excluded Assets (or similar term) as defined in the Dynegy Credit Documents and (y) and no mortgage shall be required except to the extent requested by the Lender and corresponding mortgages have been provided to the Collateral Trustee pursuant to the requirements of the Dynegy Credit Agreement and the Dynegy Credit Documents.

The Credit Documentation will provide for intercreditor arrangements that will allow for the Dynegy Priority Debt to be secured by a lien on the Collateral on a senior basis to the First Lien Revolving Credit Facilities.

## Certain Conditions

Conditions to Closing:

The effectiveness of the First Lien Revolving Credit Facility and the initial funding thereunder shall be subject to usual and customary conditions for transactions of this type and consistent with the Documentation Principles (as defined below), as well as each of the conditions to closing the Genco Working Capital Facility and the effectiveness of the Plan, including, without limitation (1) the entry of a satisfactory Confirmation Order (without stay, modification or appeal) and the effectiveness of the Plan under the RSA and receipt of requisite regulatory approvals and (2) that the Bankruptcy Court shall not have required the Borrower or any of its subsidiaries to establish a reserve or reserves for disputed claims in an aggregate amount in excess of $10 million.

| | |
|---|---|
| Conditions to all Loans: | The making of each Loan, in each case, shall be conditioned upon (a) the accuracy in all material respects of all representations and warranties in the Credit Documentation, (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit and (c) delivery of a customary borrowing notice. |
| | Additionally, the Borrower may not incur any Tranche B Loans, if (after giving effect to the incurrence thereof and the use of proceeds therefrom and any cash or cash equivalents on hand to pay the Cash Consideration) the Borrower and its subsidiaries would hold cash and cash equivalents on such date of incurrence in an aggregate amount in excess of an amount to be mutually agreed upon. |

**Documentation**

| | |
|---|---|
| Representations and Warranties: | Usual and customary for transactions of this type and consistent with the Documentation Principles. |
| Affirmative Covenants: | Usual and customary for transactions of this type and consistent with the Documentation Principles. |
| Negative Covenants: | Usual and customary for transactions of this type and consistent with the Documentation Principles (including the Borrower and its subsidiaries holding cash and cash equivalents in excess of an amount to be agreed at any time Tranche B Loans are outstanding). |
| Events of Default: | Usual and customary for transactions of this type and consistent with the Documentation Principles. |
| Documentation Principles: | The definitive documentation with respect to the First Lien Revolving Credit Facilities (the "Credit Documentation") shall (a) be drafted by counsel to Dynegy, (b) provide for maximum aggregate borrowings of Tranche A Loans by the Borrower in an amount sufficient to establish feasibility of the Plan (as defined in the Genco RSA), as reasonably agreed by Dynegy, the Borrower and the Majority Consenting Noteholders (as defined in the Genco RSA), (c) be in form and substance usual and customary for transactions of this type, (d) incorporate the terms set forth in this term sheet, (e) be consistent with the requirements of the Genco RSA and (f) otherwise be in form and substance mutually acceptable to Dynegy and the Borrower (the preceding, the "Documentation Principles"). |
| Voting: | Usual and customary for transactions of this type and consistent with the Documentation Principles. |
| Pledges of Loans: | Pledges of Loans in accordance with applicable law or as collateral pursuant to the Dynegy Credit Documents shall be permitted without restriction. |
| Yield Protection and Taxes: | The Credit Documentation shall contain customary provisions protecting the Lender against increased costs or loss of yield resulting from changes in reserve, capital adequacy and other requirements of |

law (including provisions relating to Dodd Frank and Basel III).  The Credit Documentation shall contain a customary tax gross up provision, it being understood that there will be a customary exception to the gross-up obligations for, among others, withholding taxes imposed as a result of the failure of the Lender to comply with the requirements of current Sections 1471 through 1474 of the Internal Revenue Code as in effect on the Closing Date.

|                                      |                                                                                                                  |
| ------------------------------------ | ---------------------------------------------------------------------------------------------------------------- |
| Expenses and Indemnification:        | The Borrower shall, within 15 days of a written demand therefor, pay (a) all reasonable and documented out-of-pocket expenses of the Lender incurred on, prior to or after the Closing Date associated with the preparation, execution, delivery and administration of the Credit Documentation and any amendment or waiver with respect thereto (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to the Lender and, if necessary, of one local counsel in any relevant jurisdiction) and (b) all reasonable and documented out-of-pocket expenses of the Lender (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to the Lender and, if necessary, of one local counsel in any relevant jurisdiction) in connection with the enforcement of the Credit Documentation. |

The Lender (and its affiliates and their respective officers, directors, employees, agents, advisors and other representatives) (each, an "indemnified person") will be indemnified for and held harmless against, any losses, claims, damages, liabilities or expenses (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all indemnified persons taken as a whole and, solely in the case of an actual or perceived conflict of interest, one additional counsel to all affected indemnified persons taken as a whole, and, if reasonably necessary, one local counsel in any relevant jurisdiction to all indemnified persons, taken as a whole) incurred in respect of the First Lien Revolving Credit Facilities or the use or the proposed use of proceeds thereof, except to the extent arising from the gross negligence, bad faith or willful misconduct of, or material breach of the Credit Documentation by, such indemnified person, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or any dispute solely among the indemnified persons and not arising out of any act or omission of the Borrower or any of its subsidiaries.

|                                      |                    |
| ------------------------------------ | ------------------ |
| Governing Law and Forum:             | New York.          |
| Counsel to the Lender:               | White & Case LLP   |